## Gross v. Courtley, et al.

(Decided November 19, 1914.)

### Appeal from Franklin Circuit Court.

1. Deeds—Obtained by Fraud and Undue Influence—Evidence of.— When a suit is brought to set aside a conveyance on the ground of fraud or undue influence, the court must of necessity look to circumstances rather than to facts, to the situations of the parties, to the conditions that surround them, to the attitude that they occupy toward each other, and the influences that control their actions, and putting together these various things determine whether the transaction ought to be upheld or not.

2. Deeds—Action to Set Aside for Fraud or Undue Influence— Burden of Proof.—When a deed is made by an old and feeble person to a young person who has the care of him, there at once arises a strong presumption of undue influence on the part of the grantee, and there is put upon him the burden of showing that the gift or conveyance or favor of value, whatever it may be, was not obtained by any improper methods.

3. Deeds—Cancellation of for Fraud or Undue Influence—Facts.— Where a man 78 years old, in feeble health and dependent condition, conveyed his property to one of his sons in consideration of care and attention, the burden was upon the son to show by convincing evidence that it was the free and voluntary act of the grantor, and failing to do this, the deed should be set aside and the son have reasonable compensation for his services.

O'REAR & WILLIAMS for appellant.

LESLIE W. MORRIS for appellees.

OPINION OF THE COURT BY JUDGE CARROLL—Affirming.

On March 1, 1909, C. C. Gross conveyed to the appellant, G. G. (called Garrett) Gross, a tract of land in Franklin County containing about 110 acres and worth approximately $2,500. The deed recited that the conveyance was made "in consideration of the agreement of the party of the second part to give a home to, care for and maintain the party of the first part as long as he may live, the party of the first part being old and infirm in health; and for the further consideration that the party of the second part has for the past ten years cared for and maintained the party of the first part; and for the further consideration of the love and affection that the party of the first part bears to the party of the second part." This deed was duly recorded a few days after its execution.

In December, 1910, C. C. Gross, the grantor in the deed, died, leaving surviving him as his only heirs at law seven children, the appellant, Garrett Gross, and the appellees, Kate Courtley, Mary J. Abbott and Alice Barber, daughters, and G. B. Gross, Jake Gross and B. F. Gross, sons.

In 1911 this suit was brought by the appellees to set aside and have held for naught the conveyance made by their father to their brother Garrett Gross, upon the grounds that its execution was procured by fraud and that the grantor was mentally incapable of understanding the nature and effect of the instrument.

After the issues had been formed, much evidence was taken by both parties, and the chancellor, after considering the case, entered a judgment reciting that the deed was procured by fraud and undue influence and setting it aside. It was further adjudged that Garrett Gross "have the use and profits of the farm described in the petition, free of rent from the date of the death of C. C. Gross up to March 1, 1914, and it is further adjudged that he have a lien on said farm for $300 for his services in nursing and looking after his father, in addition." It was also adjudged "that the funeral expenses, amounting to the sum of $165, and the back taxes, amounting to the sum of $102.35, be charged against the proceeds of said farm, and his bills not exceeding $10."

From the judgment setting aside the deed, Garrett Gross appeals, and from so much of the judgment as

allowed Garrett Gross the rent of the farm and the $300, the appellees prosecute a cross-appeal.

This case is not at all different from other cases of this character in the contradictory nature · of · the evidence introduced by the respective parties. There is conflict as to the condition of old man Gross' mind, as to the influence exercised over him by Garrett Gross, as to the treatment he received at the hands of Garrett Gross and his other children, as to the character and value of the services performed for him by Garrett Gross, as to the rental value of the land, and as to its value. Indeed, in almost every instance in which any witness was found to make a material statement some other witness was found to contradict him. So that on every issue presented by the pleadings or made in the introduction of evidence, there is conflicting testimony.

Looking at the case from the standpoint of the witnesses for Garrett Gross, the old man was perfectly competent to make the deed, and it was his free and voluntary act, and the services performed for him by Garrett Gross were well worth the value of the land, if not more.

On the other side, taking the evidence for the appellees, it would appear that the old man, who was about 78 years old at the time, was utterly incapable of making the deed and a mere instrument in the hands of Garrett Gross, and that serious error was committed by the chancellor in allowing Garrett Gross the rent of the land after his father's death and the $300.

It appears that old man Gross bought this farm some 30 years ago on credit, and with the assistance of his children, who were, like their father, industrious and frugal, he managed to pay the purchase price of the land, about $2,000. All of the children married, and as they married all of them left home except Garrett Gross, who was the last one of them to marry, he having married in 1907. For several years previous to 1907 Garrett Gross and his brother, Jake Gross, the only then unmarried children, lived on the farm with their father under an arrangement by which they were to take care of him for the rents and profits of the place, and in addition thereto it seems that for one year at least they paid him about $25. This arrangement continued until Jake Gross married in the Fall of 1906. So that Garrett Gross did not, as recited in the deed, ''care for and maintain'' his father for ten years prior to the execution of the deed, but only for about two years.

The old man was very much opposed to the marriage of Jake Gross, and after his marriage they ceased to be on friendly terms, and, as the evidence shows, did not speak to each other. But the other children maintained good relations with him until his death and visited him in his sickness and at different times during the years after their marriage. All of them were poor people; most of them had large families; and the care of their own families and their poverty perhaps prevented them from giving to their father the attention and care they would like to have shown him. At any rate, as illustrating in a most convincing manner that the old man felt kindly toward all of his children except Jake and wanted them to share alike in his property when he died, he made, on the 18th day of February, 1907, his will, which has been duly probated. In this will he provided that after the payment of his debts and funeral expenses, ''I will and bequeath all of my estate, real and personal and mixed, to my six children herein named: Gill Gross, Ben Gross, G. G. Gross, Alice Barber, Kate Courtley and Margaret J. Abbott, share and share alike.''

This will manifests conclusively that at the time it was made the old man did not have it in his mind to give to Garrett Gross his farm or to give to him any more than he gave to his other children except Jake. And it further furnishes very persuasive evidence of the fact that the old man then believed that the use of the farm, that Jake and Garrett had had for several years, was sufficient compensation to them for the care and attention they bestowed on him. If he had not thought so, or if he had felt that Garrett was entitled to a larger share of his estate than the other children on account of his care and attention, it seems evident that he would have made some separate provision for Garrett in his will, but he did not.

Now what caused the old man two years after this to completely reverse his expressed intention and give all of his property to Garrett Gross? There is no evidence in the record that, between the time the will was written and the deed was made, his other children did anything that was reasonably sufficient to induce him to deprive them of their share in his estate. The relations between the other children and the old man were substantially the same in 1909 as they were in 1907, and Garrett had the use of the farm in 1907 and 1908, as he and Jake had had it for several years previous. It is true that the

old man's health was declining and he was growing mentally and physically feebler each year and required increased attention. But these circumstances by themselves are not at all sufficient to overcome the expressed purpose of the old man in 1907 to give to his children, share and share alike in his property.

We are not, however, without a cause for this apparent change of mind on the part of the old man, and this cause is shown in the influence that Garrett Gross exercised over him, an influence that grew in strength as the old man grew in weakness, until finally he was a mere tool in the hands of his son, to be used and controlled in business and other affairs as his son directed and wished. From the beginning of 1909 until the old man died, Garrett was the only one of his children who lived with him continually, who saw him every day and every night, who ministered to his wants and furnished him such simple clothing and fare as he needed. It is easy to understand how, under circumstances like these, Garrett Gross could persuade his feeble and declining father to do what he pleased, even to the extent of cutting off without a cent his other children, most of whom, especially his daughters, were virtually destitute.

It is true, as has often been said, that there is no fact more difficult to establish by direct evidence than fraud or undue influence. When the courts are confronted with the necessity of determining whether fraud or undue influence exists, they must of necessity look rather to circumstances than to facts, to the situation of the parties, to the conditions that surround them, to the attitude that they occupy toward each other, and the influences that control their actions, and putting together these various things, determine from all of them whether the transaction ought to be upheld or not.

Here we have a typical case. A man, young and vigorous and acquisitive, and perhaps not too scrupulous or high-minded, who has the care and attention of a man old and feeble and dependent with the opportunities for the exercise of undue influence always present. If the old man has anything that the young man wants, he has only to be patient and watchful to get it. There may be no open evidence of undue influence. There seldom is. There may be a few witnesses found who can tell of any acts indicating it and little positive evidence to show the completeness of the dominion. The old man may indignantly resent the imputation that he could be in-

fluenced and the young man may keep the secret to himself, but nevertheless the evidence of its presence is found in the accomplishment of the act.

There is, however, in this case, in addition to circumstances that show undue influence, one fact that greatly strengthens our conviction that the deed should be cancelled. It appears that shortly before this deed was made Garrett Gross had threatened to leave his father in his lonely and helpless condition, and when he made known this intention the old man requested him to see his daughters and make some arrangement with them to live with him. It further appears that Garrett Gross did go to see two of the daughters, telling them, in substance, that the place was for rent, and inquiring if they were willing to take it and care for the old man, and these daughters told him they were. But, although they so expressed themselves, it appears that Garrett told his father that none of his other children would take care of him and that he could not do it longer unless the deed was made, and thereupon it was made.

It is also in evidence by a neighbor and disinterested witness that some time after the deed was made, the old man, in a conversation with this witness, said, in substance, that Garrett had been talking about moving away and that he had asked him to go to his daughters, Kate and Mary Jane, and see if they would take him and keep him for the rent of the place, and that Garrett said he had seen them and they would not take him, and that he, Garrett, was going to leave. He also said that Garrett told him that if he would deed the place to him he would take care of him the balance of his days.

Assuming the truth of this evidence, it cannot be open to question that the deed was obtained by direct misrepresentation and fraud.

When a deed is made under circumstances like those appearing in this case, there at once arises a strong presumption of undue influence on the part of the grantee, and this condition has induced the courts, without exception, to scrutinize with the utmost care gifts and conveyances made under circumstances that would seem to afford opportunity for the exercise of undue influence growing out of confidential relations or mental or physical weakness, and to put upon the person who obtains the favor the burden of showing that the gift or conveyance or favor of value, whatever it may be, was not obtained by any improper methods.

The law likes to uphold contracts that are made when people are dealing at arm's length, when each one of them is able to take care of his own interests, and when one is as able to understand the nature and effect of the transaction as is the other. But when one of the parties is old or feeble or weak, and the other is strong and vigorous, or when relations of extreme confidence and affection exist, the parties do not occupy toward each other that attitude of business freedom that would enable each to deal with the other on equal terms, and hence the protecting care of the courts.

Thus in Smith v. Snowden, 96 Ky., 32, a case in many of its aspects like this, the court said: ''In the case under consideration the grantors were old, ignorant and enfeebled by disease; the grantees were vigorous, aggressive and already in charge of the persons and the property of the grantors. We may say in general that when such a relation exists the persons obtaining the benefit must show, by the clearest evidence, that the transaction was freely and voluntarily entered into, and devoid of inequitable incidents. A most important feature in this case is the false recital of the consideration. These old people were themselves as clay in the hands of the potter. As to them, the question of consideration was immaterial, but it appeared important to the grantees to show to those equally and naturally interested in the partition about to be made of the estate that a *bona fide* sale had been consummated for a valuable consideration. The recital of the false consideration carries with it the thought and purpose of a designing and intentional concealment of the truth, and this falsehood and concealment are the highest evidences of the fraudulent intent with which the writings were procured, not necessarily of actual but of constructive fraud, assumed in view of the relation of the superior contracting with the inferior, the independent with the dependent, the strong with the weak. The grantees, it seems to us, can find no relief in assuming the position, after the attack on the deeds was made, that the real consideration was love and affection, and an agreement to care for the grantors during the remainder of their lives.'' To the same effect are: Hoeb v. Machinot, 104 Ky., 330; Wilson v. Winsor, 24 Ky. L. R., 1343; Highland v. Highland, 24 Ky. L. R., 2243; Koger v. Koger, 29 Ky. L. R., 235.

Turning now for a moment to the allowance made by

the chancellor to Garrett Gross, this feature of the case has given us more trouble than the other.

The old man, as Garrett testifies, had been in bad health for fifteen years before his death, and for the last two or three years of his life, although requiring little medical attention and being able to go about most of the time, was sorely afflicted with diseases of the bowels and urinary organs, that made him a burdensome and disagreeable care, and during the last few years of his life Garrett Gross, as it may be conceded, gave him fairly good waiting on and attention, and for these services was entitled to be well compensated.

The evidence of what it would reasonably be worth to give the old man such attention as he received during the last two years of his life varies from $150 to $600 a year, and the rent of the place might, we think, fairly be put at $150 a year. It will be observed that the chancellor in the judgment allowed Garrett the rent of the place for the years 1911, 1912 and 1913, the old man having died in 1910, and in addition thereto, $300. Or, in other words, he allowed him $750 in addition to the use of the place, which he had during the life of the old man.

It is strongly insisted that this allowance was excessive and entirely disproportionate to the services rendered, and there is a good deal to be said in support of this view. And while we think it was a very liberal allowance and amply as much as, if not more than, Garrett, under the circumstances was entitled to, we are yet not disposed to disturb the chancellor's finding upon this subject. The condition of the old man's health during the last two years of his life, the lack of control he had over his bowels and urinary organs, together with his general feebleness, made it extremely onerous to give him such attention as he required.

Services such as were rendered to the old man cannot be measured at all by the ordinary standards of value that may be fixed for board and clothing and ordinary attention, nor is the value of the most unremitting attention to a person merely in feeble health a fair criterion by which to judge the worth of waiting on a person so sorely afflicted as was old man Gross. There are few people who would care, for any amount, to undertake the task of waiting on a person in his condition, and while it was the duty of his son to give him, freely and without consideration, all the attention he had, yet when he is entitled, as in this case, to be compensated for such at-

tention and care and service, a liberal allowance should be made, and certainly of the allowance made Garrett Gross has no ground for complaint.

Wherefore, the judgment is affirmed on the original and cross-appeal.