## Shields v. Burge, et al.

(Decided September 26, 1916.)

### Appeal from Warren Circuit Court.

1. Fraudulent Conveyances—Confidential Relations of Parties.—In a voluntary conveyance of real property, or transfer of personal property, between parties occupying confidential relations toward each other, the burden is upon the grantee or transferee to show that the transactions were freely made, and fair, and without any undue influence exercised upon the party making them.

2. Fraudulent Conveyances—Confidential Relations of Parties.—A mother and her daughter were living together. During the last

three years of the mother's life she gave to the daughter by deed, all the real estate which she possessed, valued at about four thousand dollars, and transferred to the daughter personal property to the amount of $3,392.67, leaving her the owner of about three hundred dollars' worth of property of every kind and description. The mother had been partially paralyzed for nearly twenty years, and the proof shows she was largely influenced by her daughter, and that the latter rendered no more services to the comfort of the mother than was her duty to do, the mother performing her part of the work necessary to housekeeping, and it further appearing that the other two daughters of the mother were kind and affectionate towards her, and occupying as high a position in the affections of the mother as the favored daughter. Held, a court of equity will set aside the conveyance of the real estate, and transfer of the personal property, and order the property distributed between all the heirs of the mother under a proceeding for that purpose.

SIMS, RODES & SIMS for appellant.

T. W. & R. C. P. THOMAS and JOHN B. GRIDER for appellees.

OPINION OF THE COURT BY JUDGE THOMAS—Affirming.

This is a suit brought in the Warren Circuit Court on January 28, 1914, by appellees, Mrs. Belle Burge and Mrs. Rinda McKay, and their husbands, against appellant, Annie E. Shields, individually, and as executrix *de son tort* of her mother, Mrs. Rebecca Shields.

The relief sought in the suit is to charge the appellant as such executrix, and to procure an accounting from her of the property, if any, that went into her hands as such alleged fiduciary, and to cancel and annul a deed to a dwelling house and lot in Bowling Green, Kentucky, which the deceased mother of the parties executed to appellant on the 16th day of May, 1910, and also to charge the appellant with certain gifts of personal property made to her by the mother before her death, particularly as to a gift of a two-thousand-dollar note secured by mortgage on real property, which gift was made on September 28, 1909, and as to a gift of $1,392.73, cash in bank, which was made on March 10, 1910.

The grounds alleged for the cancellation of the deed, and the annulment of the gifts of personal property mentioned, are: (1) That the grantor and donor was not capacitated mentally to make them; (2) That they

were each procured through the undue influence exercised by the appellant over her mother, but for which they would not have been made.

During the pendency of the suit, and before it was submitted, the Bowling Green Trust Company qualified as administrator of the estate of the mother, Rebecca Shields, and filed its answer and cross-petition in the cause, making practically the same charges as contained in the petition. Upon submission, the trial court granted the relief sought by canceling the deed to the real property, and giving the administrator judgment for the amount of the two-thousand-dollar note with interest, as well as the cash checked from the bank, and ordered appellant to deliver to the administrator a note for $300.00, known in this record as the "Elkins' note," which seems to have been all the personal property that Rebecca Shields owned at her death, outside of that which she attempted to transfer to the appellant. Of this judgment the appellant complains on this appeal.

The record discloses that the parents of the parties to this suit were W. T. Shields and Rebecca Shields. They were married more than sixty years ago, and there were born to them the appellant, Annie Shields, and the appellees, Mrs. Burge and Mrs. McKay, the latter of whom is the youngest child, being at the time of the filing of this suit about fifty-five years of age. Mrs. Burge is the oldest child, and the appellant, who is fifty-seven years of age, is the intermediate one. The appellees have each been married more than twenty-five years, and almost all that time have lived away from the parental roof, Mrs. Burge living most of the time in the state of Texas, while Mrs. McKay and her family have resided a large portion of that time in the state of Florida. The appellant has never married, and has lived continuously with her parents upon the farm where they had lived since their marriage, which is located about eight miles from Bowling Green, in Warren county, and containing about three hundred acres.

From some cause, which is not at all satisfactorily explained in this record, in the late fall of the year 1908 the appellant seems to have determined to leave the farm and remove to Bowling Green. She could not persuade her father to leave the farm, but her mother was induced to do so, and in the latter part of November of that year the appellant and her mother moved into the house,

which is the one involved in this suit, located in Bowling Green, and continued to reside there until the death of the mother, which occurred on October 29, 1913. The appellant continued thereafter to occupy the house as her residence. After Mrs. Shields and appellant removed to Bowling Green, W. T. Shields continued to occupy the farm until his death, which occurred on March 16, 1909. The proof shows that when the move to Bowling Green was made by the appellant and her mother the house on the farm was practically emptied of all household and kitchen furniture, leaving the father, who was at that time more than 74 years of age, with scarcely any of the articles necessary for comfortable habitation, and with no one to do his cooking or washing, or administer to his wants or necessities in any particular whatever. He continued to occupy the farm residence thus deprived until his death, obtaining his meals almost entirely through the kindness and sympathy of surrounding neighbors.

Mrs. Shields was near 75 years of age at the ᴜme of her death. She became the owner of some real property in Bowling Green as heir to her father. This property she sold to the United States government for a post-office site for the sum of $4,500.00, and with the proceeds she invested $3,500.00 in the house and lot involved in this suit. The two-thousand-dollar note involved herein is one that had been executed to W. T. Shields in his lifetime, and had been transferred by the appellant as administratrix of her father to Mrs. Shields in satisfaction of her distributable share of her husband's estate. She also owned a limited amount of other personal property, but the record does not disclose the exact extent of it.

On the fourth Monday in January, 1910 (which was a regular county court day for Warren county), by mutual agreement of all parties concerned, the farm of W. T. Shields was offered for sale at public outcry, and was purchased by the appellant for the sum of $3,260.00, she paying at the time $1,086.67 cash, and executing three notes for the sum of $724.45 each. A deed was duly executed to her for the place, and she has been the sole owner thereof, continuously, since then. The last signature to the deed to the farm was that of Mrs. McKay, which was made on March 7, 1910, and three days thereafter the check for $1,392.73 was issued to the appellant,

which check was written by the appellant, she signing her mother's name thereto.

Upon the first ground of complaint, that of mental incapacity of Mrs. Rebecca Shields, the proof is, as is usually found in such cases, contradictory; more witnesses, however, giving their opinion that her mind was impaired to such an extent as to incapacitate her to legally do the things complained of, than those who testified that she was fully capacitated to do them.

In addition to this testimony, it is shown that more than twenty years before her death she had a stroke of paralysis, and some few years thereafter she was visited with a second stroke, and these at least, as agreed to by all the witnesses, very materially impaired her physical condition. A third stroke occurred on the day of her death, and which produced it within a very few minutes after it appeared. Some of her actions, as well as conversations, are detailed by the witnesses, which, according to our minds, have a tendency towards the conviction that her mind was, to say the least, not altogether normal. But in the view which we have taken of this case, we deem it unnecessary to determine the question of her mental capacity or incapacity, for we are firmly convinced that the record furnishes abundant proof of undue influence exercised upon her by the appellant, resulting in the conveyance of the real estate, and the transfer of the personalty complained of.

The consideration for the house and lot, as expressed in the deed, is, "In consideration of love and affection for the party of the second part, and as some compensation to her for services during my last days." The last statement, at least as forming a part of the consideration, is, according to our view of the record, wholly unfounded. In stating the services which she rendered in the home, the appellant says, "I mopped, washed, and did anything that came to hand. I did all the reading and writing in my home, and wrote all the checks. Mother looked after the coal being put in, looked after the plastering done, and the painting, and painted some, herself, and did all the cooking." Further along in her testimony she confines the washing which she did to only the clothing of herself and her mother, having this work, as to all other articles, done at the laundry. So that the services rendered, according to her own testimony, consisted of washing the wearing apparel, doing the nec-

essary mopping about the house, and all the reading and writing for the family, while her mother brought in the coal, built the fires, painted the house, and did all the cooking. It is furthermore shown that the mother did the work of cooking while they occupied the farm, before moving to Bowling Green, so that, according to her own testimony, the mother, though paralyzed, not only performed the greater amount of the work necessary to housekeeping, but the more onerous and laborious work connected therewith.

It is shown that before leaving the farm the appellant had acquired and become the owner of personal property to the value of between $3,000.00 and $5,000.00, the exact amount of which we do not know, because she declined to state when examined concerning it. This property was acquired by her becoming possessed of horses, cattle and hogs, and their increase, for many years previous to leaving the farm, which prevailed to such an extent as to call forth from W. T. Shields serious complaint that his daughter's stock had supplanted that of his on the farm. After accumulating a considerable sum from this source, and continuing it, she loaned money to various parties, and thereby acquired the sum above stated. But little, if any, of this money was invested in her father's farm, because she was already the owner of one-third of it as his heir, and the personal property given to her by her mother more than paid the other two-thirds thereof, so that we find her the owner of the three hundred acres of land, as well as some four or five or six thousand dollars of personal property, while her sisters are each poor and struggling for subsistence. After her father's death she presented an account against his estate consisting largely of articles which were bought for use in the house at Bowling Green. While there are many small items, such as candy, stamps, stationery and other minor articles, it all goes to show that she possessed an exceedingly grasping disposition, and was apparently totally devoid of generosity.

Many years ago her father gave to her sister, Mrs. Burge, a cloak of moderate value, and the appellant, in a book which she seems to have kept for that purpose, and in the performance of the "services" as doing the writing for the family, charged her sister with the value of this cloak, and the record shows other similar trans-

actions. When her father was moved to render slight financial assistance to his indigent or unfortunate brother, she loudly protested; and when her mother, after moving to Bowling Green, insisted upon giving to the daughter which she had told others that she loved best (Mrs. Burge), the sum of $500.00, an emphatic objection was registered by the appellant, which resulted in curtailing this donation to only $300.00. Many facts and circumstances might be recited, in addition to what we have shown, establishing the craving and grasping disposition of the appellant, which furnishes the motive for exercising the undue influence complained of.

It is shown that the children of appellees, upon occasions, would visit their grandparents in Warren county, and frequently their mothers would receive letters from the appellant, sometimes scurrilous in their language, and other times criticising the conduct of the grandchildren, all of which appears to have been wholly unfounded, but it all might have been done for the purpose of alienating the affections of the parents from their married daughters and their children.

Some time in August, 1908, Mrs. Burge visited her parents, and while there her father told her to buy a home and he would assist her in paying for it. The home was purchased, and the father notified about it, but it seems that he did not receive this letter, as an answer was received by Mrs. Burge, in the handwriting of the appellant, saying, in substance, that he had been put to great expense in moving his wife and Annie (the appellant) to town, and that he had given her all the money which he intended to. This letter is shown by the record not to have been written by the father, but, as stated, written by appellant, she signing her father's name to it. Upon another occasion Mrs. Burge received a letter purporting to have been written by her mother, wherein her mother was charging her with being the cause of the separation from the father, for which charge there is not the slightest foundation to be found in the record. This letter was also written by appellant.

It is shown by witnesses, some of whom are relatives of appellant, that upon some occasions when they would be at the house of appellant and her mother the articles of food would be only bread and water, and it is also shown that the mother, on more occasions than one, would resort to restaurants or confectioneries for the

purpose of obtaining food which was not supplied at the house. On one occasion she applied to the appellant for twenty-five cents with which to buy a meal, and this was refused because it was too much. However, the mother was offered fifteen cents by appellant, and she declined to take this.

When Mrs. Burge cautioned her mother to be careful about investing in real estate, the appellant promptly informed her, "Attend to your own business, and shut your mouth; that is her money and she can do as she pleases with it." Upon the death of her mother neither of the sisters was notified by the appellant, but this sad duty was performed by a cousin, a nephew of Mrs. Shields, she having requested him before her death to do so. When Mrs. Burge arrived for the funeral she did not first go to the home of the appellant, which had been the home of her mother, and it is shown by an aunt of the appellant that the latter stated that she did not want her sister to come to the house.

It is shown by numerous witnesses that the mother was influenced almost entirely, if not quite so, by her daughter, the appellant, and the orders and directions of the daughter were implicitly obeyed without a murmur or complaint by Mrs. Shields, the mother. There is nothing to show that either parent was any more, if as much, attached to appellant as to their other two daughters. Many other facts and circumstances substantiating the charge of undue influence are found in the record, but we deem it unnecessary to relate them here, being thoroughly convinced that there was but one course for the trial court to pursue, which was the one adopted, in determining that this property was acquired by the appellant through undue influence exercised upon her mother.

In cases of this kind, where the relationships between the parties are such as we find here, and the transactions assailed are without valuable consideration, the burden is cast by the law upon the one possessed of the property to show that the transaction was fair and untainted by any selfish conduct which would raise a suspicion as to the complete fairness of the transaction. Gross vs. Courtley, et al., 161 Ky. 152; Hoeb vs. Maschinot, 140 Ky. 330; Smith, et al. vs. Snowden, et al., 96 Ky. 32; Bradley vs. Bradley, 28 Ky. Law. Rep., 1261.

Under the construction of social life prevailing in this country, members of families, as they arrive at mature years, drift away from the home where they were reared, and from the association with their parents, and commence the imposed social duty of rearing families of their own. If perchance others are left at home with the parents, they should not be permitted, and are not permitted, by artifices and wiles which they may practice upon their parents, to secure for themselves the property to which the absent children have as just a claim as themselves, for it cannot be said, as a rule, that the parents only are the beneficiaries of such relationships, because observation teaches that more frequently than otherwise the ones remaining at home are the greater beneficiaries. And it is the policy of the law, when it is found that the rule just referred to has been violated, to clearly scrutinize all the facts and circumstances, and if it is found that the confidence imposed and growing out of the relationship existing between the parties has been abused, and undue advantages obtained, to correct such abuses by granting such equitable relief as the facts justify. Abundant authority might be cited in substantiation of this rule, among the latest of which, from this court, are the cases of Herzog vs. Gipson, 170 Ky. 325; Miller vs. Taylor, 165 Ky. 463; Bradley vs. Bradley, 28 Ky. Law Rep., 1261.

Thoroughly coinciding with the learned judge who tried this case, his judgment is affirmed.