## Moore's Adm'r. v. Edwards.

(Decided Dec. 16, 1932.)

TYE, SILER, GILLIS & SILER and STEPHENS & STEELY for appellant.

GRAY & FEATHER, and R. C. BROWNING and POPE & UPTON for appellee.

OPINION OF THE COURT BY STANLEY, COMMISSIONER—Reversing.

This suit is to nullify a purported assignment and to secure the possession of a certificate of deposit and a mortgage note which belonged to Mrs. Martha B. Moore, deceased. The appeal is from a judgment for the defendant.

Immediately after the burial of Mrs. Moore, while her son-in-law was fastening up her home, the defendant and appellee, C. E. Edwards, announced that the property was his; that "the old lady give it to me and it was her request that I didn't let anyone come in here and throw me out or kick me out." He said that he had the papers proving this and they were in a good

safe place. At that time he made no claim to anything else. Later he claimed almost everything else and made no claim to the house. Mrs. Moore had had a certificate of deposit for $2,300 and a note for $9,000, secured by a mortgage on the home and apartment house of her only child, Mrs. Mollie De Witt, in Louisville. Learning that Edwards had taken her papers, this suit sought to secure their possession and to have any claimed gift or assignment set aside on the grounds of forgery, deceit, fraud, and undue influence. The defendant claimed that Mrs. Moore had given him these securities and had made formal assignments of them to him on January 12, 1931, which was ten days before she died.

Without a background the picture and the figures in it would lose much of their significance.

Mrs. Moore and her first husband, Bird Skinner, to whom she had been married thirty-five years, moved from the country to Corbin. He had been a comparatively successful mountain farmer and trader and by their frugality he and his wife had accumulated a sufficient competency to live upon. He died in 1915. Shortly thereafter Edwards, who was then perhaps eighteen years old, took a room at her home. The widow married Robert Moore not long afterward. The marriage does not seem to have been a very congenial one and the husband spent part of his time in an old soldiers' home where he died in June, 1930. Except during some intervals while Moore was living, Edwards remained in the home of Mrs. Moore for the entire period of more than fifteen years. Her daughter moved from Corbin to Louisville not long after Edwards took up his abode in her mother's home.

The defendant testified that he was a locomotive engineer, but so far as this record shows he was seldom employed. He never paid Mrs. Moore anything for his board during the whole time he lived with her. His services to her consisted only of driving her automobile and doing the chores, including some little house work. But often these chores were attended to by neighbors. The evidence justifies the conclusion that this young man was living off the old lady. She loaned him money; satisfied his ''cold checks'' and paid off his debts. There was a disparity of thirty-eight or forty years in their ages. They were in no way related. Without reciting

the evidence, we may say that it shows that the appellee displayed towards this older lady an affection more like that of an ardent, passionate lover than of a son, while at the same time he was making remarks to outsiders which indicated his insincerity. When under the influence of liquor, he boasted that he had a woman with plenty of money. The evidence as to his bringing liquor into the house and of her drinking with him is contradictory. The old lady reciprocated these amorous attentions and called him "sweetheart" and other pet names. When he was away she neglected her personal appearance, and upon his return would primp up, pet him, and prepare special dishes for him. The evidence very convincingly shows, in our judgment, that by flattery, blandishments, amorous demonstrations, guile, and subtlety this young man insinuated himself into a position of dominating influence with this old lady.

The evidence does not disclose the absence of mental capacity on the part of the deceased necessary to give away property. Yet, it does disclose that she was a woman who was uneducated and unsophisticated, afflicted with Bright's disease and nephritis, having high blood pressure, which is symptomatic of ill health, and which the doctor testified impaired her mental state. About two years before the incident involved, she suffered a partial paralytic stroke. Edwards at the time observed that if she died "what she had would be his." Thereafter she became progressively weaker in body and mind. The latter was indicated by forgetfulness, confusion, and mental inactivity. Several times within a short period before her death she had expressed a realization of the failing condition of her mind. She suffered a paralytic stroke about a week after the assignments are purported to have been executed, and died two or three days thereafter. Two physicians and several laymen expressed the opinion that she was not mentally normal.

She would consult her brother and nephew, who lived nearby, and who are active business men, in regard to lending money and everything of a business nature, and depended upon them for assistance in all financial matters even of a minor nature. She had so advised with them twice during the week preceding her death about making a $400 loan, but said nothing about

this transaction. During this period she told a witness for appellee that she had plenty to live on, and, when she died, she wanted Edwards to have the remainder. The fact was, if this gift had been made, she had practically nothing to live on and this statement refutes the idea of having already rewarded Edwards.

The evidence in opposition to that upon which the stated conclusions are based is in effect that Edwards had taken care of the old lady and that she was very fond of him, referring to him as "My Edwards" and "My boy." She had several times expressed a purpose to reward him liberally for his kindness. Some doctors and several laymen testified that they regarded her as having a good mind and fully competent mentally, although weak physically.

After the death of Mrs. Moore's first husband there was some litigation over the settlement of his estate and there is a little evidence tending to show friction between the mother and daughter. But whatever that may have been, fifteen years before, we think it is conclusively shown that they were soon upon very friendly terms and that the daughter was loyal and attentive to her mother and visited her as often as circumstances would permit.

As we approach the transaction involved, the evidence may be considered a little more in detail. Mrs. Moore went to Louisville to visit her daughter for Thanksgiving and decided to stay during the approaching winter. The daughter's property was in lien to a building and loan association to secure payment of a part of the purchase price. During this visit the mother insisted that she take over the debt. The loan was upon the usual easy terms and had fifteen years to run, and there was no difficulty about the matter. But upon the insistence of the mother, a substantial premium was paid in order to get the maturity of the loan precipitated. The daughter executed her note for $9,000 to the mother, secured by a mortgage. Mrs. De Witt was in ill health and became confined to her bed while her mother was there. About the middle of December Edwards went down from Corbin. He claims he went to Louisville to see a niece who was sick in a hospital and was informed while there that Mrs. Moore wanted to see him. There is evidence that he had written her before going. Be that as it may, Edwards called upon

her at her daughter's home. With some display of feeling he told her she should not have loaned the money to her daughter. This he denied. They were closeted together for over three hours and the old lady came out crying and in a highly nervous state and said she was going home. Was this premonitory of subsequent events? Edwards drove her to Corbin the next day. She left her daughter sick in bed. On January 12, the very day that it is claimed the challenged assignments were made, the daughter was removed to a hospital and underwent a surgical operation. By reason of this she was unable to attend her mother's funeral. The night before Mrs. Moore had been notified of her daughter's condition.

Gordon Rowland, an attorney, testified that he had been informed by his mother that Mrs. Moore wanted to see him, and, in the latter part of December, he went to her home. In Edwards' presence she told him that she wanted to make over some papers to him and he advised that it could be done by an assignment. She asked about her signature, saying she had not been able to see well enough to write much in the last year or two, and he advised her that she could sign by mark. The certificate of deposit was before them, but he was not asked to prepare any assignment or other writing, and never did so. A relative testified that about this time she showed him the mortgage and wanted him to prepare her will and to take possession of the paper. He advised her that she had better get a lawyer.

The evidence as to the actual transaction, as given by the defendant, without objection, is that she was a "very peculiar old lady and didn't want anyone to know about her business." After talking over the matter of transferring the papers to him, she wanted him "to think who we could get as witnesses." She knew his brother, Mike Edwards, and his kinsman, A. B. Clark, and they agreed on them. He called the young men to come to the house. Mike Edwards testified that when he arrived she told him she wanted him to witness some papers and extracted a promise of secrecy. At that time her name was already written on the back of the certificate of deposit. She said she wanted to give it to Edwards because he had been better to her than any one else. She said she had been informed how to put the assignment on the paper and she then

and there dictated them to Edwards, who wrote them down, signed her name, and then she touched the pen as her mark was made. (The contradiction as to the signature will be noted.) This procedure was repeated with respect to the note and both papers were handed to Edwards. Clark says when he got there Edwards went into another room and produced the papers. He too says the old lady dictated the assignments as Edwards wrote them, and touched the pen to her mark.

Now, the assistant cashier of the bank, who had had several transactions with the old lady, says he only knew of her signing by mark one time, which was in the latter part of December.

These assignments are full and complete, and couched in technical legal language. They recite an assignment for a valuable consideration, when none was claimed, it being regarded throughout as a gratuity. They could have been prepared only by someone versed in the law respecting such papers, and there is no intimation by any of the participating witnesses that Mrs. Moore had a form or any guide before her.

The testimony as to the transaction is not worthy of credence. It refutes itself. This unlearned, plain woman, who was almost blind and feeble in body and mind, could not possibly have framed or dictated those instruments. *Falsus in uno, falsus in omnibus* is an old saying, worthy of all acceptation as philosophy and as an important rule by which to weigh testimony. By these assignments this old woman, proven to have been very stingy and close, while in a hilarious mood, gave to a stranger in blood all of her income producing estate, save a small tenant house, and stripped herself of all means of subsistence, without any sort of promise by the donee as to her future care and support. The one who, by the influence of nature and the common human propensities, was entitled to her bounty was her only child, who that very day, as the mother knew, was undergoing a dangerous surgical operation in a distant city. The gift was a large debt of that daughter, secured by a mortgage on her home. It was made to one who, the evidence showed, cared nothing for her, to say the least. Now, God just did not make human nature that way! Was the act due to a lack of maternal conscience or to a baneful influence? Avarice has no virtue. Greed knows no shame. This thing

was "done in a corner" and speaks for itself. It can hardly be said that reason and fact co-operate so as to induce conviction that everything was what it should have been. See Globe Indemnity Co. v. Daviess, 243 Ky. 356, 47 S. W. (2d) 990.

This young man had obtained a controlling influence and dominion over this old lady, as is manifested in different ways in this record, only some of which are indicated in the opinion because of the volume. There was not only opportunity present but opportunity seized and the power exercised.

Naturally the facts of every case are different in a more or less degree and must be adjudged accordingly. Schenk v. Schenk, 240 Ky. 237, 41 S. W. (2d) 1102; Shaver v. Weddington, 247 Ky. 248, 56 S. W. (2d) 980. The cases relied on by the appellant (Florence v. Lyons' Adm'r, 196 Ky. 697, 245 S. W. 278; Parsley v. Parsley, 233 Ky. 42, 24 S. W. (2d) 931; Dixon v. Dixon, 236 Ky. 608, 33 S. W. (2d) 611, and Schenk v. Schenk, supra) are clearly distinguishable upon the facts as well as circumstances. The conveyances sustained were to a niece, son, nephew, and brother, respectively, in consideration of past and future support, and the evidence in none of them as to undue influence was of the same character.

There are many other cases of closer application wherein deeds and voluntary conveyances were set aside—many on less convincing evidence.

We may repeat the language of the late Judge Carroll, speaking for the court, in Gross v. Courtley, 161 Ky. 152, 156, 170 S. W. 600, 602, namely:

"It is true, as has often been said, that there is no fact more difficult to establish by direct evidence than fraud or undue influence. When the courts are confronted with the necessity of determining whether fraud or undue influence exists, they must of necessity look rather to circumstances than to facts, to the situation of the parties, to the conditions that surround them, to the attitude that they occupy toward each other, and the influences that control their actions, and putting together these various things, determine from all of them whether the transaction ought to be upheld or not.

"Here we have a typical case. A man, young

and vigorous and acquisitive, and perhaps not too scrupulous or high-minded, who has the care and attention of a man old and feeble and dependent with the opportunities for the exercise of undue influence always present. If the old man has anything that the young man wants, he has only to be patient and watchful to get it. There may be no open evidence of undue influence. There seldom is. There may be a few witnesses found who can tell of any acts indicating it and little positive evidence to show the completeness of the dominion. The old man may indignantly resent the imputation that he could be influenced, and the young man may keep the secret to himself, but nevertheless the evidence of its presence is found in the accomplishment of the act.''

In Bozarth v. Banister, 143 Ky. 476, 479, 136 S. W. 902, 903, these pertinent conclusions were given:

"There is no direct evidence that the appellee influenced or persuaded F. G. Banister to make the deed disinheriting his daughter, the appellant. And the draughtsmen of the deeds testify that in their judgment he was competent to understand the nature of the transaction and to make the conveyance that he did. But, it is nevertheless true that these conveyances were both unnatural and unreasonable. It is hard to believe that such a man as the witnesses described F. G. Banister to be when he was strong and vigorous should have cut off his poor and widowed daughter without anything, and have given all of his estate to his son, unless in his feebleness and old age he was overpersuaded and unduly influenced to do it. Occupying the close and confidential relations towards him that the appellees did, and having every opportunity that this relationship afforded to influence him, it should require little direct evidence to induce the chancellor to set aside such a conveyance.''

In Hoeb v. Maschinot, 140 Ky. 330, 131 S. W. 23, 24, these sound conclusions were stated:

"Where there exists between two persons a relation of confidence and trust, by which one exerts such an influence over the judgment of the other as to subvert the latter's will and independence, a con-

veyance by the latter to the former will be set aside as fraudulent upon seasonable complaint. Whether such influence was exerted is a question of fact, to be determined from the circumstances. Evidence of the fact may consist of such relationship of blood or consanguinity, or as attorney and client, guardian and ward, physician and patient, and the like; and when such relationship is shown, and a voluntary conveyance beneficial to the grantee, the burden of proving that in that transaction the other mind acted freely, of its own volition, is on the person benefited, or the conveyance will be set aside. Smith v. Snowden, 96 Ky. 32, 27 S. W. 855, 16 Ky. Law Rep. 353; Maze's Ex'rs v. Maze [Ky.] 99 S. W. 336, 30 Ky. Law Rep. 679. The reason of the rule is it is not customary for people to give away their property, particularly to strangers in blood. It is also known that one who has the entire confidence of another can induce the latter to do with his property that which a stranger could not. Everyday observation is full of incidents of overreaching of that character. Such abuse of confidence is in law a fraud.''

And in Howell v. Chaney, 180 Ky. 646, 203 S. W. 536, 538, the following was quoted from an earlier case (Carrington's Ex'r v. Fogg, 7 Ky. Law Rep. 596):

''In an action to set aside a gift on the ground of the mental incapacity of the donor, if the evidence as to capacity is so conflicting that a satisfactory result cannot be reached by that test, resort must be had to the transaction itself, and it will be upheld if rational and just, or overturned if irrational or unjust.''

Because the law does look with suspicion upon a transfer of property by persons mentally or physically infirm to those having custody of or living with them, or where there exists a relation of trust and confidence, the burden is placed upon the party endeavoring to sustain the conveyance to prove the transaction to have been voluntary, free from undue influence and devoid of vice rendering it inequitable or unfair. Davidson v. Davidson, 180 Ky. 190, 202 S. W. 493; Howell v. Chaney, supra; Gross v. Courtley, supra; Price v. Meade, 182 Ky. 814, 207 S. W. 695. The same burden of establishing a gift inter vivos rests upon the one claiming it.

Shields v. Burge, 171 Ky. 149, 188 S. W. 321. Under such circumstances a presumption of fraud arises more readily than in case of a contract. Shacklette v. Goodall, 151 Ky. 20, 151 S. W. 23. Gifts first asserted after death of the donor are regarded with suspicion and must be established by clear and convincing evidence, particularly where the relations are such as existed here. In such cases the courts will closely scrutinize the transaction claimed to constitute the gift. Anderson's Adm'r v. Darland, 192 Ky. 624, 234 S. W. 205; Combs v. Roark's Adm'r, 221 Ky. 679, 299 S. W. 576.

This picture is full of shadows. We have no difficulty in discerning in those shadows the exercise of what is legally termed undue influence or fraud of a character which requires that the hand of equity reach in and compel the restitution of the property. Weak mentality and undue influence are usually handmaidens. Sometimes one factor is more pronounced than the other. In Shaver v. Weddington, supra, it was weakness of mind. In this case it is the dominating power of the beneficiary. While the evidence of the weakness of the decedent's mind alone would not justify a cancellation of the assignments, if in fact they were made by her, the evidence of the influence operating upon that weakened mental state is ample to require their nullification. Stege v. Stege's Trustee, 237 Ky. 197, 35 S. W. (2d) 324. In our opinion the trial court should have rendered judgment in favor of the plaintiff.

Wherefore the judgment is reversed with directions so to do.