## Harrel's Administrator v. Harrel.

(Decided January 21, 1930.)

OTTO C. MARTIN and HEAVRIN, HEAVRIN & HEAVRIN for appellant.

J. S. GLENN, MARSHALL BARNES and WOODWARD, HAMILTON & HOBSON for appellee.

OPINION OF THE COURT BY COMMISSIONER STANLEY—Affirming in part and reversing in part.

There are two issues to be determined on this appeal: (1) Who is entitled to the proceeds of a $10,000 insurance policy; and (2) the validity of an attempted disposition of property in anticipation of early death? To answer the first question it is necessary to decide whether an insurance policy should under the evidence be reformed, or whether there was a valid parol assignment of the policy. The second one requires a decision whether there was a gift causa mortis or a nuncupative will.

We may observe at the outset that while there is much evidence in the record that was heard through incompetent witnesses, and though during the taking of depositions many objections were made before the examiner, the incompetency of the evidence was waived through failure to file written exceptions with the court in the manner prescribed by sections 586 and 587 of the Civil Code of Practice.

For many years the appellee, L. F. Harrel, and his brother, Zephaniah Harrel, were partners conducting a general store and owning other property in Rockport,

Ohio county. The appellee owned four-fifths of the business and furnished the operating capital, but his duties as a railroad official kept him in Mississippi most of the time and his brother managed the store. They had reciprocal wills and insurance on their respective lives payable one to the other. Zephaniah Herrel died in 1923, leaving a widow, a son, Ray Harrel, and a daughter, Nora Harrel Walker, an appellant herein. His widow received $12,000 in insurance and a small bequest under the will, and each of the children received $500. His brother received the remainder of his property. However, it appears that appellee actually received only his brother's one-fifth interest in the business, less $160 necessarily paid to settle the estate.

When his father died, Ray Harrel, who was then about 22 years old, was clerking in a bank in the village. His uncle shortly thereafter employed him in his store. After some months, the young man having demonstrated his trustworthiness and business capacity, his uncle suggested that he would take him in partnership in the business; and a written partnership contract for five years was entered into on May 12, 1924, to be effective as of February 1, 1924. Ray Harrel acquired a two-sevenths interest in the business, for which he executed his note for $4,000 to his uncle. It was provided by the contract that Ray should look after the store and other local business interests of his uncle, should be furnished a dwelling house and merchandise from the store, and at the end of the year there was to be an equal division of the profits; Ray's share to be applied to the satisfaction of his store account, payment of interest on his note, and the remainder put back in the business. The uncle's share was to be kept in the business also. It was understood and agreed that this partnership should be conducted and the relations should be the same as those existing between Ray's father and his uncle.

1. Ray Harrel's father had had a $5,000 insurance policy issued on the life of his son, and Ray had been carrying a $10,000 policy under the United States government plan of insurance for soldiers. The beneficiary named in both policies was his father, but after his death Ray had his uncle named as the beneficiary in both policies. The uncle had no knowledge of this before the part-

nership was formed. It was provided in this partnership agreement that:

> "It is further understood and mutually agreed herein that Ray Harrel who is carrying $15,000.00 life insurance with L. F. Harrel as beneficiary shall be privileged to pay the premiums on this insurance out of the firm's money, charging same up to his individual account as he does his merchandise as long as the policies remain payable to L. F. Harrel, which shall be the case as long as this contract stands, unless mutually agreed to the contrary. It is further understood that L. F. Harrel has a policy of life insurance upon his life, being No. 169009, in the New England Mutual Life Insurance Company, of Boston, which is made payable to Ray Harrel as his beneficiary, which shall remain so as long as this contract remains in force unless he should die sooner in which case full amount of said policy is to be paid to Ray Harrel, beneficiary, as is also the case in the insurance of Ray Harrel as above stated."

Some time in the early part of 1926, Ray conceived the idea of exchanging this government insurance for a standard policy. He consulted John H. Barnes, a banker and intimate friend of his father and himself, and talked with other friends about the advisability of the change. When his uncle, L. F. Harrel, came to Rockport, he, Ray, and Mr. Barnes conferred together about the matter, and it was agreed by the three of them that the government insurance should be dropped and a policy for $10,000 secured through Mr. Barnes as agent in the New England Mutual Life Insurance Company. It is clear from the evidence that this substitution was intended to take the place of the government insurance payable to Mr. Harrel. The application for the new policy was written by Frank Barnes, a son of the banker, signed by Ray Harrel, and witnessed by John H. Barnes. This application stated that the beneficiary should be the applicant's estate, and the policy so provided. Frank Barnes, who actually prepared the application, for some unaccountable reason did not testify. A short time later L. F. Harrel and Ray were in the bank, and Ray requested Mr. Barnes to secure the policy that he might show it to his uncle. It appears that the papers of the partnership firm, of Mr. Harrel and of Ray Harrel, personally, were kept in the bank for

safe-keeping. The policy was produced, and Ray said to his uncle: "Now, here, Uncle Doc, is the policy I have had written to take the place of my government insurance, and I want to turn it over to you; it is yours, for your benefit." Mr. Harrel took the policy and turned it over to Mr. Barnes to keep for him. During this conversation Ray called the attention of his uncle to a clause in the policy relating to the right to borrow money upon it and indicated that such a provision made it a better policy. It does not appear that any other part of the policy was called to the attention of Mr. Harrel. Mr. Barnes testified that Ray had told him that he wanted to take out the new policy payable to his uncle in place of the government insurance, and, referring to the conference of the three, stated: "That was the agreement, that the beneficiary of the new policy was to be the same as that in the government insurance at the time the contract was made." It is further shown by a number of witnesses that Ray, upon several occasions, stated that he was carrying the insurance as a protection for his uncle. This uncontradicted evidence, coupled with the written agreement respecting the carrying of $15,000 life insurance payable to L. F. Harrel as beneficiary, seems to the court to show conclusively that the intention was to have the New England policy made payable to the appellee rather than to Ray's estate.

It is not disputed that policies of insurance, when the evidence warrants, may be reformed upon the ground of mutual mistake. See Insurance Co. of North America v. Evans, 229 Ky. 613, 17 S. (2d) 711. To justify such a reformation, however, the evidence must clearly and convincingly establish that a mistake was made. The court is of the opinion that the evidence in this case is of that character, and that there should be a reformation of the policy to have it conform to the manifest intention of the insured, namely, to show that the uncle, appellee herein, is the beneficiary.

But it is argued that the insurable interest of Mr. Harrel is only the extent of Ray's indebtedness to him, and he can collect no more. It appears that the principal of the $4,000 note had been reduced to about $2,400. In addition to the $5,000 policy alluded to, the appellee also received on account of his nephew and as his named beneficiary about $1,350 as the proceeds of what is commonly referred to as the "bonus insurance" allowed veterans of the World War.

It is conceded that the relation of uncle and nephew is not in itself sufficient to constitute an insurable interest. Hess' Adm'r v. Segenfelter, 127 Ky. 348, 105 S. W. 476, 32 Ky. Law Rep. 225, 14 L. R. A. (N. S.) 1172, 128 Am. St. Rep. 343; Equitable Life Assurance Society v. O'Connor's Adm'r, 162 Ky. 262, 172 S. W. 496. In Embry's Adm'r v. Harris, 107 Ky. 61, 52 S. W. 958, 21 Ky. Law Rep. 714, it was held that a creditor's insurable interest in the life of his debtor is only to the extent of his debt. In Bramlett v. Hargis' Ex'x, 123 Ky. 146, 94 S. W. 20, 29 Ky. Law Rep. 610, and Milliken v. Haner, 184 Ky. 694, 212 S. W. 605, it was held that the acquisition through assignment by one having no insurable interest in the life of the insured is against public policy, and void as between the parties. See also Bromley's Adm'r v. Washington Life Ins. Co., 122 Ky. 402, 92 S. W. 17, 28 Ky. Law Rep. 1300, 5 L. R. A. (N. S.) 747, 121 Am. St. Rep.. 467, relating to procurement of a policy by one having no insurable interest on the life of another payable to his estate, with the intention of having it assigned to him, which was held invalid. But it is generally held that a partner may insure his co-partner or an employer the life of employee. 37 C. J. 397. See Adams' Adm'r v. Reed, 38 S. W. 420, 18 Ky. Law Rep. 858, 35 L. R. A. 692, where the relation of partner as well as son-in-law existed.

All this insurance was carried by Ray, as he often stated, as a protection for his uncle, who he declared to be his benefactor and best friend. He was indebted to his uncle and intended the proceeds of his insurance to satisfy that indebtedness as well as to protect him from any other loss by reason of his death. Moreover, it was in accordance with his written agreement. The uncle had kept his part of the bargain, though he was not indebted to his nephew in any sum. Appellee was entitled to the entire proceeds. 37 C. J. 569.

Not only the original government insurance, but the policy involved in this case, was taken out by the insured himself, who individually paid the premiums; and in such state of case the beneficiary need not have an insurable interest. Allen's Adm'r v. Pacific Mutual Life Insurance Co., 166 Ky. 605, 179 S. W. 581; Rupp v. Western Life Indemnity Co., 138 Ky. 18, 127 S. W. 490, 29 L. R. A. (N. S.) 675; Western Life Indemnity Co. v. Rupp, 147 Ky. 489, 144 S. W. 743, aff'd 235 U. S. 261, 35 S. Ct. 37, 59 L. Ed. 220. This law is also conceded by appellant,

but it is contended in this instance that there was and could be no assignment in any event except to the extent of the indebtedness. The decision is rested on the right to reform the policy. When so reformed the policy will be as if it originally named L. F. Harrel as beneficiary, and his rights must be and are adjudged accordingly.

It follows, therefore, that the judgment of the lower court with respect to this insurance policy is correct.

2. The evidence shows that it was agreed by the appellee and his nephew that each would make a will naming the other as beneficiary, and that Mr. Harrel had executed such an instrument. Ray, however, had neglected to do this, although upon one or more occasions he stated his intention to do so. He went to Louisville in April, 1927, for a minor surgical operation. Serious developments resulted, and members of his family were sent for. He also had Mr. Barnes, his banker and business adviser, to come to Louisville for the purpose of making his will. When Mr. Barnes arrived, however, Ray was unconscious. On the day before his death, T. J. Adams, the superintendent of the Masonic Widows and Orphans Home of Kentucky, an old friend of the family, was present with two of Ray's aunts, and others. According to Mr. Adams, this occurred:

> "There was five or six of us in the room, and he says to me: 'Bro. Adams, I am much worse today and I am afraid I am not going to pull through. . . . If I pass away I want Uncle Doc to have all that I own because I know he will take good care of Aunt Alice.' One of his aunts, I think it was Mrs. Campfield, was on one side of the bed and his other aunt and myself were on the other side, and Mrs. Campfield asked me if that should be put in writing, and I said: 'I don't think it is necessary because there are so many witnesses here to that statement.' I didn't want to excite him in any way. Ray said: 'Bro. Adams, you know I am in sound mind and memory.' I said: 'Yes, Ray, I am sure you are,' and he said: 'Bro. Adams, I know you will see that my wishes are carried out.' "

According to one of the aunts, before Mr. Adams arrived, Ray said to her:

> "Uncle Doc has made me a partner, he has been the best friend I ever had, and we will have every-

thing fixed just like father and he did. I want him to have everything I have for I know he will take care of Aunt Alice.",

Mrs. Campfield, another aunt, testified that on this occasion Ray said:

" 'Bro. Adams, if anything happens to me I want everything I possess to go to Uncle Doc; he has been the best friend I ever had, and I know he will take good care of Aunt Alice,' and he said: 'Bro. Adams, you know I am in my sound mind and know what I am doing, and I want you to see that my wish is carried out.'

"Q. What did Adams say: did he agree to do that? A. He said: 'I will do the best I can' or something to that effect."

Ray Harrel owned some real estate and had a policy of insurance taken out by his father some years before in the Order of the Golden Cross for $2,000, payable to his father. It is not claimed by the appellee that this property passed to him, but it is claimed that the foregoing statements of Ray Harrell constituted a gift causa mortis of his interest in the partnership business. It is argued that while delivery is a constituent and requisite element of a gift inter vivos, without which the title does not pass, in a gift causa mortis, since the donor may recover possession and reclaim the title in the event of his recovery, delivery serves merely as evidence and is not a constituent element. No delivery was required under the civil law, but it is requisite under the common law. 28 C. J. 689. Foreign authority is cited by appellee in support of the proposition, as well as a statement in Moore v. Shifflett, 187 Ky. 7, 216 S. W. 614. That expression, however, is not susceptible to that construction, for the next following sentence shows the court was referring to the right of revocation and not the necessity of delivery. It was held in that case that one of the essential things of a gift causa mortis is delivery, but that it may be perfected by a symbolical delivery if it clearly appears that the donor intended to make a gift.

Whatever may be the character of the act or purpose of delivery, this court has always recognized the necessity of a delivery of some sort. In the recent case of Drake v. Security Trust Co., 203 Ky. 733, 263 S. W. 4, 5, where there was a direction by one contemplating

imminent death to another to give a sum of money to a third person, it was said:

"But whether the gift be one inter vivos or causa mortis, to be valid and pass title to the thing donated, it must be accompanied with a delivery of that thing, either actual, constructive, or symbolic; and if the transaction is not completed by such delivery during the lifetime of the donor, thereafter it cannot be completed for him by any one, for if he contemplates such completion after his death the transaction is necessarily testamentary in its nature. A gift, whether inter vivos or causa mortis, if completed, must take place during the life of the donor, while a testamentary disposition of property necessarily takes effect only after the death of the testator."

In Combs v. Roark's Adm'r, 221 Ky. 679, 299 S. W. 576, the importance of delivery as an element necessary to the validity of a gift is emphasized. See also Turpin's Adm'r v. Stringer, 228 Ky. 32, 14 S. W. (2d) 189; Howard v. Williams, 228 Ky. 259, 14 S. W. (2d) 1096, 1097; and Williams v. Letton, 228 Ky. 371, 15 S. W. (2d) 296.

It is further contended that since partnership property is in the joint possession of the partners, a constructive delivery results when the donor clearly evidences his purpose and renounces dominion over such property, which, it is claimed, was done by the deceased. It is true that a delivery may be constructive, as well as actual or symbolical, according to the nature and character of the thing given. Morgan v. Williams, 179 Ky. 428, 200 S. W. 650; 28 C. J. 634, 692. But can it be said that the deceased in this case parted with his dominion during his lifetime? His statement was that if he passed away he wanted his uncle to have his property, and in referring to having "everything fixed" as his father and uncle had he undoubtedly was thinking of his father's will. There was no intention manifested to make a gift then and there or to pass a present title. The distinguishing characteristic between a gift causa mortis and a legacy is that in the former there must be a manifest intention to surrender the property during the donor's life, and consummation by delivery—actual, symbolical, or constructive—to the donee or a third person for the donee, and an acceptance. There was no sort of delivery to Mr. Adams as the agent of the uncle nor any acceptance by

him. See Peters' Admr' v. Peters, 224 Ky. 493, 6 S. W. (2d) 499, 59 A. L. R. 969. Assuming without deciding that there need be no delivery where the donee is a partner, it is clear in this case that the deceased merely expressed his will and his desire to have Mr. Adams carry it out. As is pointed out in Innes v. Potter, 130 Minn. 320, 153 N. W. 604, 606, 3 A. L. R. 896, it is the intention of the deceased that determines whether or not the disposition is testamentary. "The test is," as there declared, "whether the maker intended the instrument to have no effect until after the maker's death, or whether he intended it to transfer some present interest." As shown in the annotations, an essential thing to the consummation of a gift causa mortis is that the delivery of possession must be with the intention that the title should then vest conditionally on the death of the donor; that if the gift is not to take effect as an executed and completed transfer of possession and title during the life of the donor, but the property is merely intrusted with another to be disposed of at his death as he may direct or shall have directed, it becomes a testamentary disposition, dependent for its validity on being executed and proved as a will. Such is the principle upon which is rested the recent case of Howard v. Williams, supra, involving some cups and saucers of the pioneer Daniel Boone. It is there said: "Admittedly there was no actual delivery of the cups and saucers to plaintiff or to any one for her, nor does the paper indicate an intention to make a gift to take effect immediately. On the contrary it is a request to take effect after the death of William Williams, and the donor did not part with possession. . . . It is also evident that it was not a gift causa mortis, for the reason that it does not indicate a constructive delivery in præsenti."

The essence of the principle applied in all cases is the vesting of title before demise. As a partner appellee may have been in possession of the partnership property, but it is inconceivable that this young man intended to part with title to all his estate or vest same in his uncle unless and until he should die. He undertook to constitute Mr. Adams as his agent or representative to carry out his wishes after he should "pass away," and did not consider him as the agent of his uncle receiving a gift in præsenti. There are many authorities sustaining this conclusion cited in the annotations in 3 A. L. R. at page 923.

We cannot escape the evident fact from the circumstances proven that this was at most a nuncupative will, which under the statute is ineffectual.

The chancellor erred in sustaining it as a valid transfer of the property to appellee.

The judgment respecting the insurance policy is affirmed, and is reversed as to the other issue.