## Shaver v. Weddington et al.

(Decided Dec. 16, 1932.)

STRATTON & STEPHENSON for appellant.

J. E. CHILDERS, O. A. STUMP, and WILLIS STATON for appellees.

OPINION OF THE COURT BY STANLEY, COMMISSIONER—
Affirming in part and Reversing in part.

This case presents two unrelated legal questions. One is the mental capacity of Mrs. Eliza Shaver to execute a deed to her surviving husband through an intermediary. The other is the proper construction of the will of her deceased first husband, D. C. Steele.

Mrs. Shaver and her first husband had been married a number of years, and had accumulated considerable property, comparatively speaking. He died in July, 1910. In 1916 she married the appellant, J. S. Shaver, who was about twenty-five years her junior. She died childless on September 3, 1930, aged about seventy-five years.

1. On March 22, 1910, her first husband, Steele, conveyed to her in fee simple a certain lot in Pikeville on which was located a large brick residence, in which they lived, and a frame dwelling. After Shaver married her, they continued to live in the property and he seems to have conducted a small mercantile business, in association with Mrs. Tom Roop, in some of his wife's other property. He had other small interests, including a limited practice of law. In April, 1927, Mrs. Shaver conveyed the residence property to Maynard, as trustee, for the purpose of having him convey it to her husband, which he did shortly thereafter. The consideration was love and affection, and the deed vested in Shaver a fee simple title subject to her life estate. Mrs. Shaver's heirs filed suit to set aside these deeds upon the grounds of undue influence and mental incapacity. There was no evidence of undue influence specifically exerted by the grantees, but the chancellor canceled and set aside the deeds on the ground of want of capacity. It is the measurement of that evidence that is now before us.

The question is as to the capacity of the grantor at the approximate date of the deed, which was April 28, 1927, three and one-half years before she died. But evidence showing the condition of her mind before and afterward is to be considered with other facts in determining her capacity at that time. Threlkeld v. Bond, 92 S. W. 606, 29 Ky. Law Rep. 177; Wiggington v. Wigginton, 194 Ky. 385, 239 S. W. 455; Thompson v. Thompson, 209 Ky. 677, 273 S. W. 522. The testimony covered the period beginning several years back and continuing until Mrs. Shaver's death, and shows a progressive weakening.

We think the evidence fairly considered showed that, when Mrs. Shaver signed the deed, she was then and had been for some time suffering from weakness of mind due to senility, and, as one of her doctors testified, from the effects of pellagra brought on by the lack of

proper nourishment. Three physicians testified to the absence of mental capacity. Many facts are related which are symptomatic of this condition, but we need mention only a few of them.

In 1923 a nephew accompanied her on a trip to California, where it seems she had lived at one time. Without reciting the pathetic facts, it is sufficient to say they were of such character that it became necessary for the railroad company to provide a special attendant for her for a considerable part of the way. Although she had property of a value estimated as high as $25,000, sometimes she would have on her table only some stale bread, and sometimes would merely pour water over old coffee grounds, or into the empty coffee pot and drink it as coffee. Her lights were turned off because of her refusal to pay her light bill, and the neighbors had to furnish her with candles. A niece who was very attentive to her tells how the old lady suggested that they, the niece and aunt, should get married, and that if the niece would do so, she would give her half of her property. Her mother had been dead several years, yet she often entertained the idea that she was still living and would be found lost in the streets and in the country, and would say that she was going to visit her mother. At other times she thought her mother dead and not buried; and again that her body was buried with her head left sticking out of the ground. She entertained the same hallucination with regard to other members of her family from time to time. Sometimes she thought some one was trying to kill her. Police officers and friends would find her wandering about the streets day and night. She would gather rubbish here and there. On one occasion she brought home an old dirty quilt from the city dump. She would take other people's clothing off the lines and porches and hide them. She would take dishes from her table and hide them securely. During high water in the river she insisted she was in California and that it was the ocean. Sometimes she would go as long as two months without changing her clothing. Upon one occasion she came to a neighbor and told her that her husband and Roop had had her in their store and tried to get her to sign a deed, which she said was her death warrant, and she became so upset that she was pacified with considerable difficulty. She refused to sign a contract for the lease of some of her property

and cried over the matter, because, she said, they were trying to break her up. She often called different neighbors her mother, and did not know some of her most intimate relatives and friends. She talked about her first husband a great deal. The schoolhouse was next to her home, and one of the teachers, who was also a neighbor, testified, among other things, that the old lady accused the school authorities of taking up her flowers and transplanting them in the schoolyard. She would stand out in the middle of the street oblivious to the danger of traffic. She sometimes said that she was one hundred and again one hundred and twenty-five years old. Occasionally the old lady's condition was such that food had to be put in her mouth. When a building was being erected nearby she carried the cement and rubbish from it into her house until her hands were almost eaten up.

The point is made in brief that some of the heirs of the grantor who testified were not competent witnesses. That, however, was waived by the failure to file exceptions to their depositions in accordance with the provisions of section 586, 587, Civil Code of Practice; Harrel's Adm'r v. Harrel, 232 Ky. 469, 23 S. W. (2d) 922.

The evidence offered to sustain the grantor's capacity is of little value. The three witnesses who participated in the signing of the deed merely expressed the opinion that she knew what she was doing. Wingo had paid her rent and done a little plumbing job for her, and he thought she was able to take care of herself in business. Yet he said when she was mad she acted "sorty funny," which he attributed to meanness or contrariness. After much "pulling" by counsel, John May said she was all right and had expressed a purpose to give the property to her husband, but he was not very certain of himself. There was some other slight evidence to like effect, but nearly every witness admitted that the old lady was regarded as crazy. Indeed, the appellant does not deny the facts of the grantor's mental condition; but says that no witnesses testified specifically as to her condition on the date of the deed. It was admitted that after that time she was at intervals without the necessary mentality. He relies upon the argument that the facts presented are not sufficient to authorize the cancellation of the deed, citing in its support many cases to the effect that age and physical infirmity, or a

subnormal mind, or senility, as evidenced by forgetfulness and other symptoms, do not show incapacity.

The deed was executed under the following circumstances:

Maynard, the trustee, testified that, while boarding with Tom Roop, who then lived in Mrs. Shaver's home, in Pikeville, she came to him and said she wanted to make the deed to this property to her husband to provide him with a home in case he outlived her, for he had been good to her, and her folks would throw him out when she died; that, since the law would not permit her to make the deed direct to him, she asked if he would act as the medium or trustee, and he agreed to do so. Mrs. Tom Roop, partner with Shaver in conducting a fruit store, testified that, when Mrs. Shaver signed the deed, she read it over and said that she wanted her husband to have her home, as her people did not like him, and would not let him stay all night after she died. She had heard the old lady express the same purpose lots of times as far back as three or four years. After her death, the Roops moved into the home property with Shaver, who boards with them. T. J. Roop, her husband, took the acknowledgment to the deed as a deputy county clerk, down at the little store conducted by his wife and Shaver. He testified that nearly every time the old lady came to him for a year or two before this she would tell him she was going to deed the property to Shaver because she did not want her people to kick him out. He read the deed, and, after it was signed, she handed it back to him, and the next day the other deed from Maynard to Shaver was signed and delivered.

There is evidence that the old lady had expressed fear of her husband, especially that he would get her property away from her; also evidence contradictory of the claims of a continuing purpose to convey him the property, as proven by the defendants' witnesses. Although the appellant seems not to have made any financial provision for his wife, but rather let her provide for him, there is little evidence that he did not treat her kindly and considerately during the fourteen years of their married life, except perhaps a time or two when he left her without protection and care for a few weeks. But the peculiar relations of Roop (who was not sure

whether he had been sober as much as half his time during the past ten years, and whose reputation was conclusively shown to be bad), and Maynard (who had been in the penitentiary three times), and the unusual conditions under which the deed was made, together with its concealment until after Mrs. Shaver's death, three and a half years later, indicate that all was not what it should have been.

There is usually a presumption of sanity, but, "when there is close relationship between grantor and grantee, coupled with circumstances showing that deed was executed when grantor was old and feeble, grantee must establish that grantor had mental capacity." Strain v. Strain, 237 Ky. 270, 35 S. W. (2d) 306; Thompson v. Thompson, supra. However to sustain a deed testamentary in character, such as the one before us, ordinarily a party is not required to produce as high a degree of proof as he is when the deed was made in a business transaction and involves the aspect of a trade. Wood v. Moss, 176 Ky. 419, 195 S. W. 1077; Stege v. Stege's Trustee, 237 Ky. 197, 35 S. W. (2d) 324; Schenk v. Schenk, 240 Ky. 237, 41 S. W. (2d) 1102. The standard always is whether the grantor had mind enough to understand the nature and character of the transaction, the property he was disposing of, and how he was disposing of it, and whether he was executing the instrument in accordance with his own fixed purpose. Lewis v. Lewis, 194 Ky. 172, 238 S. W. 410; Gillock v. Williams, 199 Ky. 169, 250 S. W. 836; Norton v. Norton, 219 Ky. 612, 294 S. W. 191; Hensley v. Hensley, 230 Ky. 575, 20 S. W. (2d) 444.

It is sometimes difficult to decide cases of this character, for they present essentially questions of fact. There can be no specific or arbitrary rule establishing a classifying line. So, many cases may be found where the evidence, though of a similar character, was held not sufficient to justify the cancellation of the instrument. Yet no two cases are exactly alike, because no two individuals are exactly alike, and the human element, or the personality of the party, enters largely into the facts. Each case must be decided according to the best judgment of the court, under the influence of general principles and analogous cases constituting controlling precedents. We have had no difficulty in reaching the conclusion that the special chancellor who tried

this case, and who doubtless personally knew the witnesses, reached a proper conclusion and was justified in setting aside the deeds.

2. The heirs of the deceased's first husband, D. C. Steele, set up claim to one-half of the property held by Mrs. Shaver under his will, which required its construction. The will names the testator's wife as executrix, and empowers her to sell such property as she might not desire to keep. It directs the payment of his debts and "to complete and furnish her said home as we have heretofore planned." The material part is the fourth clause, reading as follows:

> "I will and bequeath to my beloved wife, Eliza Steele, all of my personal property and real estate, that I may die the owner of to have, to hold and to use as she may deem proper, for her support and maintenance during her natural life. Then I request that she divide any earnings that she and I have accumulated during our marriage between her people and mine. Either by gift or will as she may deem proper."

The appellant and some of Mrs. Shaver's heirs contend that the effect of this clause is to vest fee-simple title in the widow, and that the request that she make a division "between her people and mine" is void because of the indefiniteness of the beneficiaries, is a devise over, and is ineffectual as constituting a mere wish rather than an enforceable precatory trust. The appellees, who are heirs of D. C. Steele, challenge those conclusions, and claim they are entitled to one-half of the devised estate.

We have a line of cases holding that, where property has been devised absolutely, any limitation sought to be imposed upon its disposition, or provision repugnant to the fee, will be construed as void. A typical case and one reviewing others is Wells v. Jewell, 232 Ky. 92, 22 S. W. (2d) 414. Where the devisee is given unlimited power to dispose of property, it is generally placed in this class as being a devise in fee. Commonwealth v. Stoll's Adm'r, 132 Ky. 234, 114 S. W. 279, 116 S. W. 687; Linder v. Llewellyn, 190 Ky. 388, 227, S. W. 463; Nelson v. Nelson's Executor, 140 Ky. 410, 131 S. W. 187; Young's Guardian v. Shaver's Executrix, 186 Ky. 608, 217 S. W. 902; Dorsey v. Bryan, 170 Ky. 275,

185 S. W. 845. In some of the cases of this class the limitation was expressed in precatory words. Sale v. Thornberry, 86 Ky. 266, 5 S. W. 468, 9 Ky. Law Rep. 472; Wood v. Wood, 127 Ky. 514, 106 S. W. 226, 230, 32 Ky. Law Rep. 408; Igo v. Irvine, 139 Ky. 634, 70 S. W. 836, 24 Ky. Law Rep. 1165; Gross v. Smart, 189 Ky. 338, 224 S. W. 871; Thomas, Adm'r, v. Thomas, 220 Ky. 101, 294 S. W. 776.

But the tendency has been against such interpretation under the idea that the will was not completed until signed, and that all of its part should therefore be construed together in order to arrive at the intention of the testator. Ewering v. Ewering, 199 Ky. 450, 251 S. W. 645; Parepoint v. Parepoint's Adm'r, 228 Ky. 639, 15 S. W. (2d) 513; Walker v. Walker's Adm'r, 239 Ky. 501, 39 S. W. (2d) 970.

There is a distinct line of cases noted in Beemon v. Utz, 217 Ky. 158, 289 S. W. 221; Parepoint v. Parepoint's Adm'r, supra, and other opinions, in which it is held that, if the first devise was only a life estate, the limitation over or subsequent disposition would be given effect. The same is true in respect to a qualified or defeasible fee. Walker v. Walker's Adm'r, supra. That is often accomplished by annexing to the devise of a life estate an expression indicating a disposition of the remainder. It may be a direct and specific power of appointment to be exercised by the life tenant; or a precatory trust (to be presently discussed); or a direct disposition by the testator. Beemon v. Utz, supra; Woodward v. Anderson, 145 Ky. 134, 140 S. W. 57; Graves v. Jasper, 233 Ky. 388, 25 S. W. (2d) 1040; Snively's Trustee v. Snively, 162 Ky. 461, 172 S. W. 911, L. R. A. 1915D, 153; Nelson v. Nelson, 241 Ky. 564, 44 S. W. (2d) 555; Hood v. Nichol, 236 Ky. 779, 34 S. W. (2d) 429; Maynard v. Raines, 240 Ky. 614, 42 S. W. (2d) 873.

The subject of classifying the wills and the bases upon which they are made is fully considered in Wintuska v. Peart, 237 Ky. 666, 36 S. W. (2d) 50.

It is clear that, standing alone, the first sentence in the paragraph of the will under consideration did not give the widow an absolute fee title in the property devised and not disposed of at her death, for its term

is "her natural life." See Graves v. Jasper, supra. The problem relates to the supplement:

> "Then I request that she divide any earnings that she and I have accumulated during our marriage between her people and mine. Either by gift or will, as she may deem proper."

If this is to be regarded simply as an entreaty that the widow should so dispose of what may be left, it is susceptible, as appellant argues, to the construction of a devise in fee, by considering that the testator merely stated the purpose for which he had given her the property; that is, for her maintenance. Cf. Young's Gdn. v. Shaver's Executrix, supra; and Graves v. Jasper, supra. Or it may not be unreasonable to regard it as a power in the widow not executed. Cf. Mountjoy v. Kasselman, 225 Ky. 55, 7 S. W. (2d) 512; Maynard v. Raines, supra. We think, however, the question is resolved into whether it is an enforceable precatory trust. If it is not, then the remainder was undevised estate of the testator, descending to his heirs.

In Wood v. Wood, supra, this kind of disposition of an estate is considered, and, after quoting high authorities, it is said:

> "In order to create a trust and make precatory words operative in a will, it must appear that the estate is not an absolute estate, and that the disposition thereof is not unrestricted; that the subject of the devise and the devisees must be certain, and the trust definite, and the language used must be positive and imperative, and not such as would indicate a mere wish or desire on the part of the testator, which might be complied with or not at the pleasure or discretion of the legatee."

Whether a trust of this character has been created or not depends upon whether the terms used, considered with the context of the whole instrument, are to be construed as an expression of intention on the part of the testator to dispose of the property himself or whether they are to be regarded merely as an expression of confidence or hope that the beneficiary to whom the property is devised in the first instance will do what is stated. Thompson on Wills, sec. 559. It is there further said:

"The question for determination is whether the devisee or legatee is the beneficiary, or merely a trustee for others, of the gift bestowed upon him; whether the wish or desire or recommendation is meant to govern the conduct of the party to whom it is addressed, or whether it is merely an indication of that which he thinks would be a reasonable exercise of the discretion of that party, leaving it, however, to the party to exercise his own discretion. Although the language used be in form precatory, it will·be held to be imperative, and to impose a trust if the intent clearly appears."

The word "request" is sometimes recommendatory or entreating, and is expressive only of a wish or desire that the first taker may do as asked, and the disposition is left discretionary in him. White v. Irvine, 74 S. W. 247, 24 Ky. Law Rep. 2458. This is so if the word follows an absolute devise. Gross v. Smart, supra; Goslee's Adm'r v. Goslee's Ex'r, 94 S. W. 638, 29 Ky. Law Rep. 654. It is also true that the word is often used in an imperative sense. As such it is precatory, that is, a command given in words of entreaty or permission—a delicate way of directing the doing of a thing. Bohon v. Barrett's Ex'r, 79 Ky. 378; Commonwealth ex rel. v. Willson's Adm'r, 231 Ky. 497, 21 S. W. (2d) 814. If it is to be so regarded or construed, there is created what this and some other courts have called a precatory trust, although that term has been criticized as something of a misnomer. Whatever literary exactitude may call it, an express trust may be created by precatory words, and is enforceable. Sections 88, 377, Thompson on Wills; Wood v. Wood, 127 Ky. 514, 106 S. W. 226, 32 Ky. Law Rep. 408; Gross v. Smart, supra.

If we consider the extrinsic evidence submitted in the case in order to understand the situation and relation of the parties, we learn that less than three months before the testator executed his will he had deeded a substantial portion of his estate, including their home, to his wife, absolutely. In the will he directed her to complete and furnish that house as they had planned out of the proceeds of other property. Thus his widow was secure in the ownership of a home. It is reasonably deducible that he willed that his wife of so many years should enjoy the balance for her maintenance, and that the remainder, whatever it might be, should be divided

between their respective heirs, or at least, such part of his estate as represented the joint earnings and accumulations. This disposition she might make either by gift or devise, both of which means he had employed. She was executrix of the will as well as devisee, which adds emphasis to the conclusion. Section 88, Thompson on Wills; Thomas v. Buck, 236 Ky. 241, 32 S. W. (2d) 1006. Such construction is consonant with the rule that the making of a will gives rise to the presumption that the testator did not intend to die intestate as to any part of his estate, and in the absence of any indication to the contrary, he is presumed to intend to dispose of his entire estate himself. Section 56, Thompson on Wills; Young's Gdn. v. Shaver's Ex'r, supra; Walton Bank & Trust Company v. Carpenter, 205 Ky. 629, 266 S. W. 358; Westerman v. Rastetter, 206 Ky. 295, 267 S. W. 180. The presumption is particularly strong where the residuary is disposed of by will, and an intention to exclude residuary bequests must appear from appropriate language evidencing that intention or by clear implication; and "a residuary clause will be construed so as to avoid partial intestacy unless a contrary intent is apparent." Sections 57, Id. The rule applies just as strongly to testamentary trusts, and the courts will uphold them instead of searching for reasons for avoiding them or dealing with them with any degree of disfavor. Thompson on Wills, section 562; Holmes v. Walter, 118 Wis. 409, 95 N. W. 380, 62 L. R. A. 986; Rong v. Haller, 109 Minn. 191, 123 N. W. 471, 806, 26 L. R. A. (N. S.) 825.

We may note a few cases in which expressions similar to that used in this will were held to create a trust. Thus in Girdler v. Girdler (Ky.) 113 S. W. 835, the term "will and desire" was deemed equivalent to the expression "I direct," and held to be a restriction upon the first devise and to create a precatory trust.

In Commonwealth ex rel. v. Willson's Adm'r, supra, the phrase, "I wish to will my property to my husband, asking that he in turn leaves it equally to my two children," was held to create a trust under which the husband took only a life estate with the remainder to his children.

In Thomas v. Buck, 236 Ky. 241, 32 S. W. (2d) 1006, the term "I would like," when construed with the entire

instrument, and being addressed to a fiduciary or custodian of a fund, was held mandatory and to create a valid trust.

In Nelson v. Nelson, 241 Ky. 564, 44 S. W. (2d) 555, a wife's will devising her estate to her husband, except a certain specific bequest, and having a clause providing that the husband should make provision for a devise to her sons of such estate as might be possessed by him at the time of his death, it was held to create a trust; the words, "my desire" being construed as equivalent to a specific direction.

We conclude, therefore, so far as the language of the will is concerned, it constituted a disposition by the testator himself and was sufficiently mandatory.

Other constituent elements of a precatory trust being present, it remains to be seen whether the beneficiaries are sufficiently definite, for uncertainty as to them may destroy a trust. Section 500, Thompson on Construction of Wills. As stated by that author in section 135, it is sufficient if the beneficiary is designated with a reasonable certainty, that is, such certainty that he may be readily identified and distinguished from every other person. The expression used by this testator was "her people and mine." Without doubt he meant the heirs of his wife and himself, for it is a popular expression to refer to one's relatives as "my people." A devise to "my relatives" or "my relations" is to the heirs according to the statute of descent and distribution. Wooten's Trustee v. Hardy, 221 Ky. 338, 298 S. W. 963. In the absence of any term indicating otherwise, it is to be per stirpes, Johnson v. Johnson's Adm'r, 222 Ky. 180, 300 S. W. 636. It is like a devise of a remainder estate to "my bodily heirs," used in the sense of "children" and passing the fee. Faulkner's Gdn. v. Faulkner, 237 Ky. 147, 35 S. W. (2d) 6.

It is to be noted that the disposition of the remainder of the estate after the death of the widow was confined to "any earnings that she and I have accumulated during our marriage." This, however, referred to the balance remaining after she had equipped their home, a sufficient sum for which was given to her absolutely. It may be that the testator had other property than that which represented the earnings of his wife and himself, such for example, as by inheritance. There was

no disposition made of it. The presumption of entire testacy to which we have referred is a rule of construction only, and, where there is no ambiguity, it has no bearing. It is a reasonable view that, if there was other estate than that which had been accumulated by the joint efforts of the testator's wife and himself, he wanted it to go to his own heirs alone, and so made no testamentary disposition as to it. This is a question of fact which should be developed and the estate settled accordingly.

That this may be done, and for this purpose only, the judgment construing the will of D. C. Steele is reversed.

In all other respects the judgments are affirmed.