## McGill v. Dunaway et al.

(Decided Feb. 13, 1934.)

C. C. ADAMS for appellant.
F. A. HARRISON and A. M. SAMUELS for appellees.

OPINION OF THE COURT BY JUDGE RATLIFF—Affirming.

R. K. Dunaway was a citizen and resident of Grant county, Ky. He had been twice married and a number of children born of each marriage. He owned a farm of about 101 acres which he inherited from his father. In December, 1919, for a recited consideration of $100· he deeded his farm to his wife, now his surviving widow, and within about one month later, January, 1920, he executed a second deed to his wife for the purpose of correcting an error in the former deed. In February, 1923, he joined in a deed with his wife conveying the same farm to the appellant, G. A. (Bert) McGill. In. March, 1924, Dunaway instituted this suit in the Grant circuit court for the purpose of canceling and setting· aside the above-named three deeds, on grounds of fraud.

Plaintiff alleges in his petition and amended petition that in December, 1919, the defendants conspired for the purpose of obtaining from him his farm and represented to him that his children of his first marriage were going to take his land away from him and unless he deeded it to his wife that he would lose his land; that:

relying on said representations to be true and not knowing they were false he executed and delivered a deed to his wife, Sarah E. Dunaway, on the 15th day of December, 1919; that the consideration for said deed is stated therein to be $100 cash in hand paid, but in truth and fact he never received any consideration whatever for his land; that within about one month thereafter they told him that there was some defect in the deed and it would be necessary for him to execute a new deed for the purpose of curing the defect in the former one; that relying upon these representations and not at that time knowing they were false, he did execute the later deed for the alleged purpose of curing a defect in the former one and that no consideration was received by him for either of the deeds and both deeds were executed by him because of the misrepresentations and false statements of defendants which were known to them to be false and made with the fraudulent purpose and intent of cheating and defrauding him of his land. That thereafter in February, 1923, the defendants in furtherance of their conspiracy represented to him that his children by his first wife had brought suit in the Grant circuit court against him for possession of his farm and that the court had appointed defendant Bert McGill to take charge of it and that he would have to join with his wife in making a deed to McGill; that relying on these representations, he did then and there join with his wife in execution of the deed to the said land to defendant McGill; that the deed to McGill recited a consideration of $3,000 cash paid, but that he nor Sarah E. Dunaway received no consideration whatever and that the deed was wholly without consideration; that he was an old man, in feeble health, and not physically or mentally capable of protecting himself, and that the acts of the defendants were pursuant to a conspiracy to so defraud him of the said land and that since and before the inception of the scheme and conspiracy to deprive him of his farm that the defendants had been guilty of illicit cohabitation, and they took advantage of his old age and feeble health and by their representations and threats caused him to execute all of the aforesaid deeds, none of which were supported by any consideration; that defendant McGill entered into possession of the land and since that time has had the possession and use thereof. He prayed for a cancellation of the three deeds and for $1,500 damages for the loss of the use and benefits of his land.

A demurrer to the petition was overruled, whereupon defendant McGill filed his separate answer traversing all material allegations of plaintiff's petition and further alleged that he bought the said farm of the defendant Sarah E. Dunaway who was then the sole owner of same and that the plaintiff only joined his wife in the deed to him. Pursuant to an issue out of chancery a jury was impaneled to hear the evidence and returned its findings of facts on the following questions: (1) The alleged conspiracy between defendants; (2) the market value of the farm; (3) the damages, if any, to plaintiff for the loss of the use of the farm; and (4) whether or not the plaintiff or Sarah E. Dunaway received any consideration from Bert McGill for the farm in question and, if so, what consideration was received from McGill by them or either of them for the same. The jury returned its verdict finding (1) that defendants did conspire together to cause the plaintiff to make the deeds to Sarah E. Dunaway and to join in the deed of Sarah E. Dunaway to her codefendants, McGill; (2) the market value of the farm to be $4,000; (3) plaintiff is entitled to $1,000 damages for the time he was deprived of the use of his farm; (4) that there was no consideration for any of the deeds made to the defendants by the plaintiff.

The court entered judgment canceling the deeds of plaintiff which he made to his wife, Sarah E. Dunaway, and the deed to McGill in which he joined with his wife in 1923, and further adjudged that in the event the farm cannot be returned to Dunaway free of liens and mortgages, Dunaway should recover of McGill the sum of $4,000, the value of the farm, and that Dunaway is entitled to the immediate possession of the farm and entitled to an execution on the judgment for $1,000 damages.

Motion and grounds for a new trial were duly made and overruled, hence this appeal.

The question to be determined is whether or not the evidence is sufficient to support the finding of the jury, and chancellor.

The plaintiff was introduced in his own behalf, but not being competent to testify against his wife his testimony does not have much bearing on the case. However, he did testify that he obtained the property from his father, and lived on the farm and made money on it

but after he joined in the deed to McGill for the farm, he left it and had no money since that time; that he never received any money for his farm; that he had lived with his kin folks part of the time and stayed in the county poorhouse part of the time after he left his farm. The defendant McGill was next introduced by plaintiffs as if on cross-examination, and again introduced on his own behalf after the conclusion of plaintiff's testimony. We will refer to his testimony later herein.

Fanny Cornell, a married daughter of the plaintiff, testified that plaintiff left his home in 1924; that she was at home with her parents at the time her father made the deeds to her mother; that McGill and her mother told her father that his first children (meaning the children of his first wife) were going to take his farm away from him; and that she heard her mother and McGill tell him that. She was asked what effect that seemed to have on him when they told him that and she answered: "It scared him, he didn't know what to do." She further stated that the defendants told her father that McGill was in charge of the farm. She was asked about the condition of her father's health and mind and she stated that he never was healthy and his mind was never good; that her father was 68 or 69 years old at the time he made the deed; that after he left the farm he stayed at different places with his kin folks and the county poorhouse part of the time. At that time he was staying with one of his daughters and that she and her sister were supporting him; that she saw him frequently and was with him part of the time, and knew that he never had any money. She stated that prior to the execution of the deeds to her mother in 1919 and 1920, that McGill frequently came to their home; usually every day and sometimes twice a day. On some occasions her father was at home; on other occasions he was out working; that McGill and her mother would ask the children to go out and play and give them pennies to leave the house. Forrest Dunaway, son of the plaintiff, testified that he was at home with his parents between the years 1919 and 1923, the time of the making of the deeds in question; that McGill came to their house frequently and at times when his father was not there; that McGill talked to his mother and gave him and the other children pennies to leave the house, and they left his mother and McGill

alone at the house. He said he heard his mother and McGill talking about the farm and heard McGill say that he was going to have the farm; but that he never heard McGill say anything to his father about it, only on one occasion he heard McGill say something about his father's first wife's children were coming to take the farm from him. Hattie Godman testified that she lived about three-fourths of a mile from the Dunaway farm and while Dunaway and his wife lived on the farm along about the year 1924, she saw Mrs. Dunaway and McGill go into Dunaway's barn; that before going into the barn she saw McGill go up one hollow and Mrs. Dunaway went up another hollow. She saw McGill go into the barn and Mrs. Dunaway took her horse in the barn and Mc-Gill left his horse on the outside and they went on into the barn. She further stated that in conversation with Mrs. Dunaway, they were talking about his children taking his farm away from him (Dunaway) and she asked Mrs. Dunaway who told her that and she said McGill told her that and that he had been at Williamstown and came back and told her that. She gave it as her best recollection that this conversation was before the deed was made or about that time; that Mrs. Dunaway stated to her that McGill had influence over her and she could not help it. She was asked if Mrs. Dunaway told her that she had ever done wrong with McGill and she answered: "Yes, sir." Later on cross-examination she said Mrs. Dunaway told her that McGill had intercourse with her. When asked about the condition of Mr. Dunaway's mind she stated that he would run like he was afraid and would try to hide himself. On these occasions he would say: "Bertie." (Meaning Bert Mc-Gill.) And on about three of these occasions he would start over home and would come running back and when asked what he was running from, he would say, "Mr. Bertie, he is over there." He always called Mr. Mc-Gill "Mr. Bertie." She further testified that after Dunaway left his home in 1924, he stayed around with his people part of the time and laid around the barns in the neighborhood where she lived for a week or two and was in the county poorhouse part of the time. William Gill testified that before Dunaway made the deeds to his wife that Mrs. Dunaway told him that the land would be taken from them if it was not deeded away before Saturday night and said that Ed Mardis and G. A. McGill had told her that; that Ed Mardis is a cousin of McGill. Mrs. Emma Meeks testified to substantially the same

state of facts as the preceding witnesses relating to the statements of Mrs. Dunaway—that Mr. Dunaway's first wife's children were coming to take his farm unless he deeded it away and that these statements were made before he made any of the deeds to the defendants. W. H. Daugherty stated that he witnessed the deed plaintiff made to his wife in January, 1920. That Dunaway came to him and asked him to go down to the bank and said he had to sign something and wanted him and Mr. Alcoke to go with him. He asked Dunaway what he was going to sign and Dunaway said: ''I have got to make a deed of some kind, I don't know just what it means hardly.'' Mrs. Claude Breeden, daughter of the plaintiff, stated that in the year 1919 before her father made the first deed to her mother, she had heard her mother talking to her father and trying to get him to make her a deed to the farm; that her mother told her father that his first wife's children were going to take it away from him. She also testified that during the year 1919, Mr. McGill came to their home frequently and that the children were sent out to play; that on one occasion that her mother and Mr. McGill were in the cellar together and she fastened them up in the cellar and they stayed in the cellar for about five minutes. She admitted, however, on cross-examination, that she was not friendly with Mr. McGill and indicated that some ill feeling existed between them. When asked why she fastened them up in the cellar she said: ''For a kid's prank, that is all.'' She does not say that she knew anything wrong between her mother and Mr. McGill.

A number of witnesses were introduced to show the value of the farm at about the time the deeds were made and also the damages to plaintiff as result of being deprived of the use of the farm from February, 1924, to the date of trial. The jury found and it was so adjudged by the chancellor, that the value of the farm was $4,000 and plaintiff was entitled to recover of defendant $1,000 damages for the loss of the use of the farm. The evidence on those points was conflicting but we are unable to say that the finding of the chancellor and jury is not sustained by the evidence.

The defendant McGill was introduced by the plaintiff as if on cross-examination. In an effort to explain the payment of the consideration recited in the deed, $3,000, he stated that Dunaway and his wife wanted to remain on the farm and they entered into a contract

whereby they were to occupy the house and a certain part of the farm for a consideration of $1,000 to be credited on the purchase price thereby leaving the sum of $2,000 to be paid in cash. He stated that Dunaway had a mortgage on the farm in the sum of $300 and a note in the Corinth Bank for $380 with accumulative interest amounting to $400 which he also paid leaving a balance of $1,300. He was asked if he had a check showing that he had paid the $1,300. He answered: "I have got checks. I didn't pay it all at one time." He was again asked to show the check with which he paid the $1,300. He answered: "Over there." (Indicating.) "Q. Get it. A. Checks and accounts together." "Q. I want your check showing where you paid $1,300." "The Court: Get it and hand it to him if you can. A. Here is a note for $1,300." "Q. I don't want the note. What are you doing with the note? A. It is paid." "Q. Let's see your check paying it. A. Well, here you are, a whole bunch of them." "Q. Pick out $1,300 that you paid on that note." (No answer.) "Q. Checks showing where you paid $1,300 to her. * * * A. Well, I can explain this. * * *" "Q. Show me the checks where you paid $1,300. A. There is some of those checks that I have got lost." "Q. You have not got them, have you? A. There are $78.00 worth of checks." "Q. Just show me the checks you have paid her for the amount of $1,300. * * *" After a series of other questions and answers similar to those above quoted, McGill finally stated that he did not pay off the first note in checks but paid with money for which she gave him no receipt. He said she would not accept a check for $1,300. He said he later borrowed $900 of the money of her for which he gave his note, which note he produced with various credits. After counsel had further insisted that he produce the checks representing the credits on the note, he finally produced a check dated August 1, 1927, for $50. This was more than four years after the execution of the deed. Other checks and credits are as follows: July, 1925, $28.50; May, 1931, $1.50; October, 1926, $5; August, 1926, $8.42. Without giving time and space to copying all of these items of credit, it suffices to say that he produced between 30 and 40 checks in sums ranging from $1 to $6 or $8 and probably one or two items $10 or $12, the total sum of which was $171.82. The dates of these checks ranged from 1925 to 1931. When asked to explain how he paid the balance of the consideration he said that he had accounts credited on

the note and endeavored to show that he had sold Mrs. Dunaway certain livestock and farm products.

Respecting the mortgage of $300 and note and interest of $400 which he paid as a credit of the purchase price of the farm, it was later shown that these were the obligations of Mrs. Dunaway which were incurred by her after she had obtained from her husband the deed to the farm. 'There is no proof conducing to show that the plaintiff, R. K. Dunaway, received any consideration for the land. McGill insists that he finally paid Mrs. Dunaway the $1,300 note with accumulated interest in cash. When asked from what bank he drew the cash, he stated that he and his wife had the cash in their home which they had realized from their farm products, live stock, etc., and that he did not have the cash in any bank. It is insisted by counsel of appellee that it was unusual and in fact unreasonable to believe that McGill and his wife had $1,300 in cash in their home which they accumulated from time to time from sales of stock, farm products etc., and never had deposited it in any bank. It appears from the checks he produced that he had a bank account, and was in the habit of transacting his business through the banks. He offers no explanation why he and his wife kept this sum of money in their home and never deposited it in any bank. However this may be, it was a circumstance for the jury's and chancellor's consideration and from which they had the right to draw their own inferences and conclusions.

McGill denied that there was any conspiracy between him and Mrs. Dunaway to induce R. K. Dunaway to make the deeds to his wife or to join in the deed with his wife to McGill. He says that R. K. Dunaway solicited him to buy his farm and insisted on selling it to him. He also denied all the evidence relating to his intimacy with Mrs. Dunaway and denied that he and Mrs. Dunaway or either of them ever asked or induced the children to leave the house at any time when he was in Dunaway's home.

It is insisted for appellant that R. K. Dunaway ratified the deed from himself to his wife which was executed about three years previous to the execution of the deed to appellant, during which time he took no steps to avoid the deed which he made to his wife and acquiesced therein and for these reasons he is guilty of

laches and estopped to complain of joining in the deed with his wife to appellant. In support of this contention is cited Hall v. Bolen, 148 Ky. 20, 145 S. W. 1136, Ann. Cas. 1913E, 436, and other cases relating to the same general subject-matter. An examination of these cases discloses that the facts are not analogous to the facts in the instant case. In the instant case there is no proof conducing to show that the influence which induced Dunaway to make the deed to his wife had been removed or that he had otherwise discovered that he had been defrauded prior to the time of the institution of this action. Where an instrument is procured under such circumstances as to render it voidable for fraud and undue influence, neither laches nor acquiescence can be based upon a failure of the injured party to move for its cancellation while the same conditions which caused its execution continue. Ratification of the contract induced by fraudulent representations will not be inferred from delay in seeking its rescission when the injured party had no knowledge of the fraud practiced on him and where the delay was the result of his misplaced confidence in the false statements made to him. 4 R. C. L., sec. 26, pp. 515, 516. Between the date of the deeds from Dunaway to his wife and the deed to appellant McGill, it appears that Mrs. Dunaway had mortgaged the farm to the bank of Williamstown to secure a $300 note, which appellant claims he paid as a part of the consideration for the farm. But it is not shown that R. K. Dunaway knew of this transaction.

In view of the undisputed evidence of a number of the witnesses who testified with respect to Dunaway's mental condition, it is obvious that he was a man of below average mentality and in fact bordering on imbecility. Had he been a man of average intelligence and business ability his right to recover herein would indeed be doubtful. It is insisted for appellant that threat of litigation is not such duress as will entitle a person to relief. This contention is based upon the allegation that it was represented to Dunaway that his first wife's children were going to take his farm away from him, but there was no threat of personal injury or violence to him and for that reason the mere threat of litigation is insufficient to support his cause of action. As above stated, had he been a man of average intelligence and business ability, no doubt he would not have been moved to make the deeds to his wife or to McGill, but on the

other hand would have stood on his legal rights. But in view of his ignorance and lack of intelligence and mental capacity to protect his rights, if he was induced to believe and did believe that he was in danger of losing his farm and thereby induced to execute the deeds, the fact that as a matter of law his children could not have succeeded in recovering from him his farm is immaterial.

In the case of Chess & Wymond Co. v. Simpson, 82 S. W. 601, 26 Ky. Law Rep. 893, it is held where one contracting party misleads the other by willful deception into believing a fact to exist that does not exist by which the agreement is induced the law does not deem it a meeting of the minds of the contracting parties and the injured party is entitled to a rescission of the contract. See, also, Hunter v. Owens, 9 S. W. 717, 10 S. W. 376, 10 Ky. Law Rep. 651. The issues and facts involved in the cases supra were analogous to those involved in the instant case.

From the facts disclosed in this record it is obvious that McGill was an intelligent and shrewd business man, and so was Mrs. Dunaway superior in intelligence to her husband, R. K. Dunaway. It is our view that the proof is amply sufficient to sustain the finding of the chancellor, in which he had the aid of a jury of the community, that McGill and Mrs. Dunaway took advantage of the ignorance and inferior business ability of R. K. Dunaway, thereby inducing him to execute the deeds in question. It is a well-known rule that courts of equity will protect the ignorant and weak when it reasonably appears that they have been preyed upon by their superiors in intelligence and business ability, and, under such circumstances, fraud will be inferred from evidence and circumstances reasonably indicating that the parties did not deal at arm's length. Chess & Wymond Co. v. Simpson, and Hunter v. Owens, supra.

It is next insisted that there was no tender or restoration of consideration which, it is argued, was a necessary prerequisite to the cancellation of the deeds. But it will be remembered that the basis of the suit is that Dunaway received no consideration, which the chancellor and the jury found to be true. It seems that appellant paid some consideration for the farm but Mrs. Dunaway was the recipient of same. Furthermore the suit is grounded on the theory that the deeds from Dunaway,

to his wife were procured by fraud and for that reason no title passed from him to his wife and therefore he was the owner of the property at the time he joined with his wife in the deed to appellant, and in these circumstances whatever consideration McGill may have paid to Mrs. Dunaway was not binding on R. K. Dunaway. Appellant cites some authority on the general rule of restoration of consideration received in cases where a rescission of a transaction is sought. However, there are exceptions to this rule. There are cases where a court of equity will rescind a contract without a repayment or tender by the injured party. L. & N. R. R. Co. v. McElroy, 100 Ky. 153, 37 S. W. 844, 18 Ky. Law Rep. 730. The chancellor with the aid of the jury found that Dunaway received no consideration for his farm and therefore he could not be required to refund anything.

It is insisted for appellant that much of his testimony is undisputed and therefore must be taken as true. Uncontradicted testimony may not be accepted where witnesses' statements are vague and indefinite and inconsistent with other statements and the circumstances. Martyn v. Jacoby's Adm'r, 223 Ky. 674, 4 S. W. (2d) 684.

It is insisted for appellant that he improved the land and paid taxes on it for which he had not been paid. The record does not disclose any counterclaim or other pleading upon which this claim is based, and this question is raised for the first time in brief of appellant. The rule that no judgment will be rendered not supported by the pleadings is too well known to require citation of authorities.

In view of the testimony as a whole, considered in connection with the attending circumstances, we are forced to the conclusion that the evidence is sufficient to support the finding of the chancellor. It is a well known rule that this court will not disturb the finding of a jury or trial court when supported by substantial and probative evidence.

Perceiving no error prejudicial to the substantial rights of appellant the judgment is affirmed.

The whole court sitting.