## Schimmelpfennig et al. v. Jungkind.

(Decided Feb. 22, 1938.)

ROBERT C. SIMMONS and EDWARD W. PFLUEGER for appellants.

BENTON, BENTON, SMITH & LUEDEKE for appellee.

OPINION OF THE COURT BY STANLEY, COMMISSIONER—Reversing.

The question in this case is whether the judgment setting aside a deed to a remainder interest in real estate upon the ground of fraud and deceit is proper. Particularizing, the question is whether the grantor was ignorant of the character of her title and had she known the true status would have executed the conveyance.

The background and sequences are necessary to an understanding of the immediate transaction.

Otto Jungkind and his family for many years ran a grocery in Covington. About four years after the death of his first wife he married Mrs. Katherine Meyer, on June 15, 1920. At that time he had three daughters, two of whom were married. The other was married two years later. Their mother had owned property on Woodburn avenue in Covington in which the business had been conducted. She had devised it to her husband for life with remainder to her children. The second Mrs. Jungkind, appellee herein, states $250 of her money had been put in the place. This was sold and property in Erlanger purchased with the proceeds in February, 1925 It consists of a storeroom and an apartment, worth about $3,500, and is the property involved in this suit. Jungkind and his wife conducted a confectionery and toy shop in the building. He died August 29, 1933. His will, dated May 16, 1930, bequeathed his entire estate to his widow, Katherine Jungkind, for life, and at her death certain sums to charity and to each of his five grandchildren, with the residue given to his daughters. When he died, however, his estate had greatly diminished. Other than the

Erlanger property and stock of merchandise, worth about $350, he owned two or three shares of stock in a grocery company, a $500 equity in some real estate in Ohio, and had $4,000 on deposit with a building and loan association. This, however, is "frozen" and its ultimate recovery is doubtful.

During all these years, as is conceded by everyone, there was an extraordinary devotion existing between the stepmother and the three daughters. Her counsel in brief, with commendable candor, disavow any purpose of insinuating that this affection and the solicitude of the daughters for their stepmother was other than genuine and sincere. However, they express the opinion that the present events were the result of the quite human weakness of avarice on the part of the oldest daughter, Mrs. Sophia Schimmelpfennig.

On Saturday afternoon after the burial of Mr. Jungkind, the family, including the husbands of two of the daughters, assembled. The widow got from a drawer, to which she had the key, his papers, including his will and the deed to the Erlanger property. The will was read, but it seems no attention was given to the deed. The evidence is that the primary subject and consideration at the time was how their stepmother should be taken care of under the circumstances. She was then 77 years old They all realized the limitations of the estate, and offered her a home if she wanted to move; each of the daughters expressing a willingness to help her. All of the ladies were under the impression that the title to the property had been in Otto Jungkind, and that his widow had only a life estate in it as devised. On the following Monday, Mrs. Jungkind and her stepson-in-law, Mr. Schimmelpfennig, took the papers to the bank in Covington which had been named as executor of the will. The trust officer suggested that they should employ an attorney. It seems immaterial whether the retention, some ten days later, of the Honorable Edward W. Pflueger was at the suggestion of Mrs. Jungkind or whether he was employed by her or by the daughters, as she testified. He was agreed upon by all of them.

A day or two later Mr. Pflueger went to the home for a consultation. The deed was at the bank, but some tax receipts they had before them bore the names of both Mr. and Mrs. Jungkind, and the suggestion was

offered that perhaps the title had been in them jointly, or with the remainder to the survivor. Whether her reference is to this conference or to the previous one at which only the family were present, Mrs. Jungkind testified that she had said to them that at her death she wanted what property she had "to go back to the girls"; that she had no close relations; that those she had never "bothered me"; and "I thought more of them girls than I did of my own." This reference is to her own people, for she had no children. The testimony of the three daughters, differing only in minor details, is to the effect that Mrs. Jungkind repeatedly stated that she realized the property belonged to the girls since it had come through their mother, and she wanted them to have it at her death. Mr. Pflueger's evidence emphasizes the expressed affection and the solicitude of the daughters for the future welfare of their stepmother. A few days later he examined the record of the deed to the Erlanger property and found that it had been conveyed to both Mr. and Mrs. Jungkind, with title to the survivor; hence that she was the sole owner. A day or so later Mrs. Jungkind and Mrs. Schimmelpfennig went to his office. Mrs. Jungkind's explanation as to why she went there is:

"Well, the only thing I went, the reason I went down there with the girls, because I told them I was going to give them, when I die, what the will said, they wanted the house, wanted me to give it back to them if I died, I told them, yes."

Mr. Pflueger's testimony is that he carefully explained the status of the title, and further:

"Well, Mrs. Jungkind appeared to be as much surprised as Mrs. Schimmelpfennig was to learn that this property was hers and not in her husband's estate, she got up to emphasize her remarks and disavowed any desire to keep this property entirely for herself. Here's in substance what she said: I want these girls to have this house when I am gone; and she said, I want it fixed so that they will get the property after I am gone. She said something about not having any close relations, that these girls here were all she had, and they had been good to her. In that sort of way she was trying to tell me as emphatically as she could that she didn't want to retain it in such a way as to de-

prive the girls of any hope or expectancy, and she said, 'as far as that's concerned I want them to have everything when I am gone.' "

Mr. Pflueger explained that this could be done by a will or deed, and advised Mrs. Jungkind that if she made a will it might be lost or destroyed or she could modify it, but if she made a deed it would be difficult, if not impossible, for her to change her mind. Said he:

"She got up again and gesticulated, as she did here on the stand, 'that's the way I want it fixed.' "

He thereupon prepared a deed, retaining for Mrs. Jungkind title to the property for her lifetime, and conveying the remainder interest to the three daughters. This is likewise the testimony of Mrs. Schimmelpfennig. Mrs. Jungkind's testimony on this point is that Mr. Pflueger never told her it was her own property, but that he read the deed which he had made out and she signed it. However, elsewhere in the course of her testimony she stated that she did not remember that the deed was read, and, again, that no one read it over to her before she signed it. She remembered that two deeds were made, one of which "sold the house to Miss Rekers and she sold it back," and she stated that she did not understand what "we were doing."

Mr. Pflueger had Mrs. Jungkind to execute a deed to the property to his secretary, Miss Rekers, and had her immediately convey it to the three daughters. His explanation of this unusual and outmoded procedure is that, somehow, he had running through his mind that Mrs. Jungkind was a married woman and that it was the better way. Though entirely unnecessary, the method was harmless, except, perhaps, to create some confusion. After these two deeds had been executed and acknowledged, Mrs. Jungkind and Mrs. Schimmelpfennig took them to the courthouse to be recorded. Appellee testified Mrs. Schimmelpfennig later wrote her to get the deeds, but she neglected to do so.

During these consultations it was agreed that the widow could perhaps be better taken care of if she should, within the year, renounce her husband's will. Perhaps the personal property was particularly in mind. The deeds were executed September 11, 1933. Nine months later Mrs. Kordenbrock, one of the daugh-

ters, went with her to Mr. Pflueger's office and she formally renounced the will, after he fully explained what it meant and why he considered it better for her, mentioning specifically she would be entitled to receive absolutely one-half of the $4,000 and exemptions of $750. She had already received the benefit of the merchandise; the other personalty being used for funeral expenses.

It appears that Mrs. Schimmelpfennig returned to her home near Chicago a short while after her father's death, and Mrs. Kordenbrock stayed several months with her stepmother; the two continuing to run the store. Then she ran it alone for a short while. In the summer of 1934, Mrs. Kordenbrock went to San Antonio to visit her sister, and while she was away the sister of Mrs. Jungkind's deceased husband stayed with her. During this period, Edgar G. Jackson, the husband of the sister-in-law's daughter, and his wife would occasionally go there. It appears that at Mrs. Jungkind's suggestion or request Jackson ascertained and reported to her that she had had the sole title to the property by reason of the survivorship clause and had conveyed it to the three daughters, subject to her life estate. Mrs. Jungkind's evidence is that this was the first knowledge she had that she had been the sole owner of the property. After this she employed counsel, and this suit was brought to set aside the conveyances.

The case calls for the application of well-settled principles of law. There are many cases of like kind. It is well to bear in mind that:

> "The cancellation of an executed contract is the exertion of the most extraordinary power of a court of equity, which ought not to be exercised, except in a clear case and on strong and convincing evidence." Lossie v. Central Trust Company of Owensboro, 219 Ky. 1, 292 S. W. 338, 340; Fields v. Cornett, 254 Ky. 35, 70 S. W. (2d) 954, 955; Petrey's Adm'r v. Petrey, 262 Ky. 222, 90 S. W. (2d) 4.

If the evidence merely raises a suspicion of fraud, question of undue influence, or uncertainty of mental capacity, it is not sufficient to set aside a deed or other instrument. But if the situation of the parties, the nature of their relations and confidences, the degree

of mentality of the grantor, the dominance of the grantees, the apparent motives and influences, and the inequity of the transaction—in short, the entire circumstances—lead to the conclusion that the execution of the deed was the product of deception and fraud, equity will not hesitate to right the wrong and restore the title. Stege v. Stege's Trustee, 237 Ky. 197, 35 S. W. (2d) 324, 325; Moore's Adm'r v. Edwards, 248 Ky. 517, 58 S. W. (2d) 915; McGill v. Dunaway, 254 Ky. 234, 71 S. W. (2d) 435; Maddox v. Maddox, 258 Ky. 121, 79 S. W. (2d) 402.

The deed involved being a testamentary one, the degree of mental capacity is not required to be as high as if the transaction were one of bargain and trade. Schenk v. Schenk, 240 Ky. 237, 41 S. W. (2d) 1102; Shaver v. Weddington, 247 Ky. 248, 56 S. W. (2d) 980; McCutcheon v. Bichon, 267 Ky. 694, 103 S. W. (2d) 76. In such a case the question is whether the grantor had mind enough to understand the nature and character of the transaction, the property he was disposing of, and how he was disposing of it, and whether he was executing the instrument in accordance with his own fixed purpose. Shaver v. Weddington, supra; Petrey's Adm'r v. Petrey, supra; McCutcheon v. Bichon, supra. In this record there is no intimation of any mental frailty of the grantor, except her own admission, and, as manifested in her testimony, that she had become quite forgetful. Three years, however, had elapsed when she was testifying and she was then 80 years old. She was active in body and, with this exception, apparently in mind. She had been the executor of her first husband's will; had assisted her second husband in carrying on his small business; and after the deed was executed continued to be active for one of her age. Though admittedly not versed in titles and transfers or business intricacies, no impression is laid by the evidence of an inability to comprehend this transaction, whereby she was making a testamentary disposition of the property. The case, of course, must be tried upon the record. Over against the clear and emphatic evidence of Mr. Pflueger—upon whose standing and integrity there is cast no kind of aspersion—that Mrs. Jungkind clearly understood exactly the status of her title and what she was doing with it, and the testimony of the daughter, Mrs. Schimmelpfennig, there is only her testimony which itself indicates a forgetfulness.

There is no evidence of undue influence. Chrisman v. Quick, 174 Ky. 845, 193 S. W. 13; Henson v. Jones, 247 Ky. 465, 57 S. W. (2d) 498. The grantor's own statements of affection and a recognition of the moral claims of the daughters to the property, coupled with the apparently fair evidence of the three of them, and the testimony of the reputable attorney, who was acting for all the parties, make all one way the evidence that she desired this disposition. Of like character is proof concerning the solicitude of the daughters for her welfare. That consists not only of expressions, but of acts. Here was a voluntary conveyance of property, the title of which was believed by all interested to be in the daughters until investigation developed it not to be. The conceded kind and affectionate relations existing for so long a time point directly opposite to an evil motive. Reciprocation and appreciation of acts of kindness is a virtue, and that one chooses to exercise it ought not to be regarded as the result of a pernicious influence, in the absence of clear and convincing evidence. Collier v. Dundon, 164 Ky. 345, 175 S. W. 635; Wood v. Moss, 176 Ky. 419, 195 S. W. 1077. It must be remembered that even where the facts present a double aspect, one consistent with fair dealing and the other involving dishonesty of purpose, the court, unless the scale decidedly predominates for the latter, will strike the balance in favor of honesty and innocence.

It may be said also that the grantor did not strip herself of her entire property. She had received all of the personal estate of her deceased second husband. By renouncing his will she had become entitled to nearly two-thirds of whatever was realized from the savings deposit. She would continue to receive the income from this property, all of which was rented, excepting two rooms in which she lived. In addition, she had a little estate derived from her first husband. Therefore, the transaction cannot be said to be inequitable or in any degree unnatural or unconscionable.

The attack upon the deed was predicated in the petition upon fraud and deceit and undue influence. There is no plea of failure of consideration. No consideration is necessary to support a conveyance of this character. Neurenberger v. Lehenbauer, 66 S. W. 15, 23 Ky Law Rep. 1753; Wood v. Moss, supra; Risner v. Risner, 261 Ky. 359, 87 S. W. (2d) 970. But during the course of their examination the daughters testified

that they had verbally agreed that should Mrs. Jungkind desire to sell the property, or it seemed best or necessary for her use, they would consent to it. It was developed that Mrs. Schimmelpfennig at some subsequent time had declined to join in a mortgage which Mrs. Jungkind had wanted to place upon the property. Her reasons were sound. The two daughters, when asked if they were willing now to join in a conveyance, declined because of the pendency of the lawsuit. The trial court seems to have attached some weight to these refusals as indicating unfairness and a failure to maintain their end of the bargain. But it does not seem to us that these developments can have any bearing on the decision whether the deed was obtained by deceit or undue influence.

We cannot concur in the judgment of the chancellor setting aside the two deeds; therefore reverse the judgment, with directions to dismiss the petition.