### Calveard et al. v. Reynolds et al.

Jan. 30, 1940.

W. A. Hubbard and McCandless & McCandless for appellants.

W. E. Wooldridge for appellees.

OPINION OF THE COURT BY STANLEY, COMMISSIONER—
Affirming.

The appeal is from a judgment for the defendant in a suit to set aside a deed to an improved tract of land in Oldham County, worth at least $15,000, executed by Richard W. Reynolds, deceased, to his daughter-in-law, Mrs. Lulie Adams Reynolds, on January 2, 1933. A degree of brevity requires that we state only a general outline of the evidence contained in a voluminous record and forego distinguishing the precedents.

The grantor was of high character, intelligent and forceful and had been a man of large activities. He had owned and operated a farm of 600 acres near Goshen, and another of 72 acres three miles away at Prospect. He had three children, Warren, Sam and Mary. Warren married in 1897 and brought his wife home. Sam lived at home until 1899, and was married in 1901. The daughter, Mary, never married and lived in the home until her death in 1918. Warren died in 1910 and his widow, Mrs. Lulie Reynolds, and her two daughters remained with the father. In time, one of those daughters married and soon thereafter brought her husband, E. Z. Wilhoyte, into the family home. In 1922 Mr. Reynolds sold the 600-acre farm and built a house on the 72-acre tract, to which the family moved. During these years Mrs. Lulie Reynolds and her family were supported entirely by Richard Reynolds and the children were educated by him. However, they attended

to the household duties and made the home. All seemed to have lived well.

The son, Sam, lived for a brief time in Pittsburg and then returned to Louisville. He was dependent upon daily wages at first one job and then another, until in later years he became settled as an embalmer with relatively permanent employment. His family consisted also of a wife and two daughters. They lived in humble circumstances in comparison with his brother's family at the old home place. There is much evidence that as time went along the father complained about Sam's calls for financial assistance and that he regarded Sam as something of a ne'er do-well; but the documentary and tangible evidence does not establish any unusual or disproportionate assistance, nor that Sam deserved the censure or charge of being a financial drain upon his father.

In 1925, Mr. Reynolds executed his will in which he devised his estate to his wife for life and the remainder to his descendants, thus showing that he then had no disposition to charge up anything against Sam. On the contrary, he wanted him to share the estate equally with the children of his deceased son, Warren. Nor did he mention his daughter-in-law, Mrs. Lulie Reynolds, in the will as deserving payment or special consideration for services rendered him and his wife. It was not long afterward that the health of Mrs. Reynolds, the wife, failed. It appears that she suffered a paralytic stroke, and for three years was an invalid. A part of the time, perhaps a year, a special nurse or attendant was provided, but Mrs. Lulie Reynolds had the full responsibility of nursing and looking after her and, as well, the management of the household. Mrs. Reynolds died in April, 1928.

About six months later, Mr. Reynolds, in company with two friends, visited his son, Sam, who was then employed in Harlan. He expressed pleasure and pride in the fact that Sam was so well liked and had been complimented by several of the citizens of that town. In May, 1931, Mr. Reynolds executed another will. In this he bequeathed $5,000 to Mrs. Lulie Reynolds for her services, and devised the residue of his estate equally to Sam and Warren's children. At that time the old gentleman was receiving an income from his stocks and bonds and from the 72-acre farm. The will is tangible and potent proof that he recognized his obligation to his

daughter-in-law. It also shows that he had no reason to disinherit his son, Sam, or to have him treated other than equally with the children of his deceased son, Warren. However, during that year the income from his investments ceased. He leased the farm to his grandson-in-law, Wilhoyte; in consideration that he take care of the household and keep up the property. This was his own family and his mother-in-law, as well as. Mr. Reynolds.

The attitude during the years of Mrs. Reynolds toward Sam and his family and her treatment of them and their treatment of and consideration for the old gentleman, with the respective denial and justification, may be passed over. It is enough to say the mutual dislike had become an aversion when Sam died in Louisville on December 24, 1932. According to one side, Mrs. Reynolds advised Sam's family that there was no room to to bury him in the family lot in the country. On the other side, it is said that they were advised that there was room for one body and Sam could be buried there, but there would not be room for members of his family. He was buried in Louisville. His father did not attend the funeral. Some say, including plaintiff's witnesses, that he was not able to do so; others say that he simply did not care to go. Within ten days the deed in question was executed.

J. T. Gregg, a business man of Shelbyville, and a nephew of Richard W. Reynolds, enjoyed his confidence and had always been quite intimate. Gregg testified that a few days after Sam's death he spent the night with his uncle and on the way home from a call upon an old friend and neighbor, J. W. Mounts, that evening, Mr. Reynolds stated he wanted to deed Lulie the home but didn't hardly know how to do it. Gregg offered to have the deed drawn and suggested that a nephew of Reynolds' wife, L. D. Magruder, who lived in Florida, was in Louisville and that they would attend to the matter, which pleased Mr. Reynolds. Other testimony and circumstances show that this conversation occurred on the night before Sam was buried. In his earlier life Magruder had lived near the Reynolds place and had always been upon intimate terms with the family, except Sam, whom he regarded, as he testified, as being a disgrace to the Magruder and Reynolds families. He deposed that Gregg had advised him that Mr. Reynolds wanted to transfer the farm to Lulie if it could be done,

and also that Mr. Reynolds told him that he had discussed with his nephew Gregg some method of compensating Lulie for her care and attention throughout the years and that Gregg had suggested making a deed of the farm to her. Mr. Reynolds said that was what he wanted done. He gave Magruder an old deed from which to obtain the description. Magruder prepared a deed which he took to Prospect and went over several times with Mr. Reynolds, who was pleased with it, especially that part which reserved a home for himself and insured the same care and devotion from Lulie that he had received in the past. After the draft of the deed was approved, Magruder took it to Shelbyville and he and Gregg had an attorney examine it and had it copied after some technical changes. Each of these men claims credit for having suggested the reservation in the deed that we have related; but that does not appear important. Variance as to immaterial incidents sometimes fortifies testimony as to the material for it shows the absence of a prearranged story. The next day L. D. Magruder and his brother, Richard, took Mr. Reynolds to Louisville. They had a notary public come to the automobile where he was and there witness the execution of the deed and take his acknowledgment. On the return home Mr. Reynolds handed the deed to his daughter-in-law, with a statement of appreciation that if he had a thousand acres to give her it would not be sufficient compensation for her kindness.

Mrs. Lulie Reynolds testified that she had no knowledge of the deed or of any purpose of the grantor to make it until its delivery. The appellants point out that it would not be likely that she would have prepared the old gentleman for the trip to Louisville without having some knowledge of its purpose. There is no contradiction of the circumstances surrounding the execution of the deed as above stated, except the testimony of Mrs. Solomon, to which we shall refer later, that one night about this time and just before she heard of the deed having been made, the Magruder brothers and a strange woman came to the Reynolds' home. The implication is that it was the notary public to take the acknowledgment. But Mrs. Lulie Reynolds testified that on that occasion she had been brought home from Louisville by her two cousins, and the evidence above recited shows it to have been otherwise.

At the time the deed was executed Mr. Reynolds

was 83 years old. He lived for a year and nearly four months afterward. The deed was promptly put to record and all parties knew of its execution. The suit to set it aside was brought several months after his death by the two daughters of the deceased son, Sam. The suit is predicated upon allegations that the grantor was of advanced age and physically and mentally infirm and, therefore, had been unable to resist the fraud and undue influence charged to have been exerted by the grantee and others in obtaining the execution of the deed. This condition, it is pleaded, vitiated the conveyance and made the deed void.

While the grantor was physically infirm, it cannot be and is not claimed that that alone is evidence of an impaired mind. The preponderating evidence is that he had retained his firm will power and strength of mind. Another potent consideration is the absence of evidence minimizing the years of devotion, care and services bestowed upon and rendered by Mrs. Lulie Reynolds to her mother-in-law during her lifetime, and particularly during the period of her invalidism, and to her father-in-law to the date of his death, a period of about 35 years. While it is maintained that Sam and his family visited the old gentleman frequently as occasion presented, even though it was unpleasant because of the attitude and lack of hospitality and courtesy of Mrs. Lulie Reynolds, it is not claimed that they had done anything for the old gentleman. On the contrary, it is shown, at least, that he felt he had been neglected by them. The contradictory evidence along this line, with perhaps an exaggeration on both sides due to misunderstanding and antipathy, has been given a disproportionate importance in the record and argument. In short, the plaintiffs insist that the defendant had prejudiced the old gentleman against their father and his family and had given him the erroneous idea that he was wholly dependent upon the defendant. They point out isolated statements of the grantor made throughout the years indicating this attitude and conception, which it is insisted were not justified. It may be admitted that the disposition of what was left of a once substantial estate smacks of unfairness in the consideration of equality of inheritance. One son left home and made his own way and supported his family. The other son remained at home, and his family to the third generation received their support and maintenance in relative opulence.

But they kept the home and tenderly cared for the old folk in their years of need and dependence.

The right of a man to give away his estate to whomsoever he desires is a right of all freemen. His view of right and justice controls—not that of any other man or set of men. Cecil's Executors v. Anhier, 176 Ky. 198, 195 S. W. 837. If the grantor, of his own free will and accord, chose to reward the daughter-in-law and disinherit the family of his other son, the courts will not thwart his purpose by destroying his act. Before the arm of the law is used in such a case as this there must be proof of facts establishing the purpose and act to be those of another and not those of the grantor. A court of equity is quick to invalidate an act or deed of a person of weak understanding and liable to imposition, if the nature of the transaction and the surrounding circumstances justify the conclusion that he did not exercise his deliberate judgment but was imposed upon, circumvented or over-reached by cunning or undue influence. Wilson v. Oldham, 51 Ky. 55, 12 B. Mon. 55; Stege v. Stege's Trustee, 237 Ky. 197, 35 S. W. (2d) 324; Moore's Adm'r v. Edwards, 248 Ky. 517, 58 S. W. (2d) 915; Schimmelpfenning v. Jungkind, 273 Ky. 182, 115 S. W. (2d) 895. But we have little or no evidence here of any weakness of intellect or susceptibility to undue influence. We have very tangible evidence that two years before the deed was made, when the grantor had considerable personal estate and was admittedly of strong mind and disposing memory, he had manifested a purpose to recompense or reward the grantee, for he provided in his will that she should receive $5,000. That was his last will and testament. In the interim the personal estate had all but vanished and it had been necessary that Mr. Reynolds borrow $300 from his daughter-in-law. The advancing years were accompanied by physical infirmity, so it was not unnatural that he should adeem the bequest and provide a home for her who had ministered to him in his need. The nature of the act—the conveyance of the property in which the grantee had made and kept a home and would continue to keep it to the end of his days—is not such as indicates that the grantor was the victim of prey.

Looking at the other phase of the case—the exercise of undue influence—the evidence introduced in behalf of the plaintiffs is in the main that of Mrs. Martha Solo-

mon. She was a cousin of the elder Mrs. Reynolds and had been a close and intimate neighbor for a lifetime. Some feeling had arisen between her and Mrs. Lulie Reynolds' family. Partisanship for the plaintiffs is manifested in her testimony. Some witnesses say and indicate that she was exaggerative or garrulous.

Her testimony consists of statements made to her by both the grantor and grantee. There were several statements by Mr. Reynolds in substance that the daughter-in-law was nagging him or "dogging the life out of me" for his property, and had been doing so since the death of his wife, which was in 1928. That witness expressed the opinion he would do anything to have peace. The time fixed for most of the statements was before the will of 1931 was executed, or the deed made. After the deed was made and the old gentleman's eyesight and hearing had failed he made other statements to the witness, but they were in effect but indications of helplessness and impatience with the restraint that the daughter-in-law had placed upon him. It must be remembered that he was then nearing 85 years of age and quite infirm physically. Normal senility had come and he was living on a much traveled highway. From time to time Mr. Reynolds complained about having an expensive family; that the bills were too high; and that they ought to live more cheaply. We suppose such complaints are universal. They are normal and to be expected. Perhaps yielding to a family's importunities is a yielding to influence, but if that be "undue influence," then rare indeed is the man who escapes it. The witness also related several occasions in which Mrs. Reynolds stated that the only way she could get the old gentleman to do anything was to "dog him until he did it." And, again, that when she could do nothing with him she got his nephews to influence him. But on one occasion, at least, he resisted to the end and did not buy a new automobile.

Shortly before his death, Mr. Reynolds undertook to have some stock transferred, with the greater part to Mrs. Lulie Reynolds and her family, and the balance to Sam Reynolds' family. The transfer was not completed because the company was then in receivership. Mrs. Solomon's evidence indicates that this transaction was undertaken through Mrs. Lulie Reynolds' dominance. Other acts and statements subsequent to the execution

of the deed are not of much probative value on the single question in issue.

The foregoing general outline of the record, it seems to us, makes the conclusion inevitable that the evidence falls short of showing the deed was obtained by undue influence. It is to be borne in mind that we are dealing with a testamentary conveyance, coupled with an obligation on the part of the grantee to continue to care for the grantor as long as he lived. Cf. Dixon v. Dixon, 236 Ky. 608, 33 S. W. (2d) 611. It is familiar law that modest persuasion or arguments addressed to the understanding or the appeal of affection cannot be deemed undue influence in a legal sense. Wood v. Moss, 176 Ky. 419, 195 S. W. 1077; Stege v. Stege's Trustee, supra; Schenk v. Schenk, 240 Ky. 237, 41 S. W. (2d) 1102; Schimmelpfenning v. Jungkind, supra.

Lacking from the case on one side is proof of substantial weakness of mind, and on the other, of proof of dominance, threats, superiority of will, or of ingenuity or artifice which could be said to destroy free agency or constrain the grantor against his will or render him unable to refuse what another wanted done. More than that, other than the result, there is no evidence tending to show that undue influence had been exerted. Wise v. Foote, 81 Ky. 10; Schenk v. Schenk, supra; Shaver v. Weddington, 247 Ky. 248, 56 S. W. (2d) 980; Maddox v. Maddox, 258 Ky. 121, 79 S. W. (2d) 402; McCutcheon v. Bichon, 267 Ky. 694, 103 S. W. (2d) 76.

The judgment is affirmed.