# Young et al. v. Mitchell et al.

March 5, 1946.

As Modified on Denial of Rehearing June 7, 1946.

Rodes K. Myers and G. D. Milliken, Sr., for appellants.

Hubert Meredith for appellees.

OPINION OF THE COURT BY JUDGE DAWSON—Affirming.

This is an action to set aside a deed which was executed and delivered by Jane Mitchell to her son, James A. Mitchell, one of the appellees herein, on June 2, 1943, by which she conveyed to him a tract of land in Warren County containing 155 acres of land, retaining a life estate therein.

Mrs. Mitchell died on June 14, 1943, at the age of

seventy-eight. In September 1942, she sustained a fall causing an injury to her hip and from that time until her death she was constantly confined to her bed.

The original petition attacked the deed on two grounds: (1) Mental incapacity, and (2) undue influence allegedly exerted over the grantor by her son who had been living with her since 1932. By an amended petition the appellants claim that an actual delivery of the deed had never been made.

When Jane Mitchell died she left surviving her as her only heirs at law the appellants Ada Young, T. G. Mitchell, and Edmond Mitchell, and the appellee James A. Mitchell. There is some testimony to the effect that at one time Mrs. Mitchell had made a will, but the will was never found and so far as this controversy is concerned it must be considered that she died intestate.

The deed in question was prepared by the attorney for appellees as a result of a letter written to him by the appellee James A. Mitchell during the month of May 1943. About nine o'clock on the night of June 2, 1943, the deed was executed by Jane Mitchell in the presence of James A. Mitchell, Clyde Upton, his wife Effie Upton, and Holly Raymer, a Notary Public who took Mrs. Mitchell's acknowledgment to the deed. The deed was not recorded until June 19, 1943, which was five days after the death of the grantor.

Many witnesses were introduced on both sides. The testimony for the appellants shows that the appellee James Mitchell had been away from home for some twenty-seven years but returned with his then wife in the year 1932. His wife died the following year and after the death of his mother he married his present wife who is the other appellee herein.

It appears that at the time the appellee returned to his home he was not in good health and for some time did little or no work and spent the greater portion of his time hunting and fishing. Apparently the mother, Jane Mitchell, was an active woman for her age until she sustained the injury in September 1942. The appellant, Mrs. Ada Young, did not learn of her mother's injury until the 16th day of October 1942. From time to time she stayed with her mother (according to her testimony a total of twelve nights and twenty-nine days, not con-

secutive) between the time she learned of her mother's injury and her mother's death, but that she had her own home and family and could not leave them oftener in order to take care of her mother. According to her testimony she and her brother James were not congenial and he resented her coming to their mother's home. On one occasion he ordered her out of the house. She stated that the deed was never mentioned to her either by James or her mother; that her mother's memory was very bad; that she could not remember people, and on one occasion failed to recognize her younger sister. She testified that on the day the deed was executed her mother did not possess sufficient mind to know the consequences of her act. She also testified that her brother James never did have any regular employment; that her mother fed and partially clothed him; that her mother and James had trouble constantly and in support of this filed, as exhibits, letters from her mother indicating that the relationship between the two was not the best. She stated that on one occasion there was an attempt made to have her mother removed to a hospital and that an ambulance was sent for this purpose but that James refused to permit his mother to go, threatening to leave if she did. There is also some testimony concerning the settlement of some small indebtedness which Mrs. Mitchell apparently owed to James but which we think is not of particular importance.

Hollie Young, the husband of the witness just referred to, stated that he saw Mrs. Mitchell some fifteen or eighteen times from the time she fell until her death, these occasions being when he took his wife there to see her mother; that Mrs. Mitchell's condition gradually grew worse; that her mind was bad; that her memory was faulty; that James frequently left his mother and that he did little, if any, work about the farm except raise a few tomatoes and some strawberries.

Clarence Upton, who had known Mrs. Mitchell all his life, said that her physical condition was bad and that in his opinion she did not possess sufficient mind to execute the deed.

T. H. Stringfield, who had also known Mrs. Mitchell all his life, said that he was at her house frequently after she fell and was there in May 1943, the last time; that in his opinion she did not possess sufficient mind to make a deed when he last saw her in May; that towards the

latter part of her life her memory became faulty; that she and James did not get along very well and that he did little, if any, work, and that his daughter did most of the washing for Mrs. Mitchell.

James Upton said that he had known Mrs. Mitchell all his life; that he had noticed that her mind was "getting bad" for some time prior to her death; that James insisted that his mother deed him the farm in order to keep him out of the army, although at that time James was over sixty years of age. He also testified that Mrs. Mitchell did not possess sufficient mind to convey her property.

With the exception of a physician, whose testimony we shall refer to later, these are the only witnesses who testified that Mrs. Mitchell did not have sufficient mental capacity to execute the deed in question. In addition to these witnesses the appellants introduced Morris White, Raymond Stringfield, Charles Enochs, Gilbert Barber, and Hope Stringfield. None of these witnesses expressed an opinion as to Mrs. Mitchell's mental capacity, and their testimony is largely confined to her physical condition and to some extent the relationship between James Mitchell and his mother.

The physician introduced by appellants was Dr. R. C. Moss who saw Mrs. Mitchell twice, the first of May and on the 9th of June 1943. He testified that she had a complication of diseases, had a fractured hip and had no control of her kidneys and bowels. He stated that there was no treatment that he could give her except symptomatic treatment unless she was taken to a hospital, which he advised. He stated that in his opinion she was not mentally competent at the time she executed the deed. However, it is pointed out by the appellees that he admitted he was not an expert on mental diseases and had no special experience and possessed no particular skill in diagnosing or treating mental cases. He further admitted that he made no examination to test her mental capacity and was concerned only with her physical condition. He discussed her physical condition with her and admitted that she understood his inquiries and that she was able to explain her condition to him. He failed to elaborate on his opinion as to her mental capacity and did not give any facts or circumstances upon which he based his conclusion that she did not have sufficient mind to transact business.

On the other hand, the appellees introduced, in addition to their own testimony, twenty witnesses, all of whom testified that Mrs. Mitchell was in full possession of her mental faculties up until the time she died, and related conversations and transactions with her which showed that the execution of the deed was done pursuant to a purpose of long standing and which she had expressed for a number of years.

It will not be necessary to refer in detail to the testimony of all these witnesses, but in order that the general effect of this testimony may be realized, we will refer briefly to some of the more material portions thereof.

Holly Raymer, the Notary Public who took the acknowledgement of the deed, testified in detail concerning the execution of the deed; he stated that Mrs. Mitchell was mentally sound; that she signed the deed and that he thought he read the deed to her. He stated that he talked with her for a few minutes and explained that he was there to take her acknowledgement to the deed, and that she said she was glad of it as she had been wanting to do it for a long time.

Allen Cherry, who apparently is one of the outstanding men of the community in which Mrs. Mitchell lived, testified in substance that Mrs. Mitchell was a strong willed person and that he did not believe anyone could control or influence her, and that she was in her right mind.

Hettie Cherry, a younger sister of Mrs. Mitchell, testified that she saw Mrs. Mitchell at intervals, the last time (before the day of her death) in the latter part of April, approximately one month before the deed was executed; she stated that at that time the condition of Mrs. Mitchell's mind was the same as it had been all her life and that there was nothing at all the matter with her mind. She testified that she was a person who was not easily led or influenced but that she had a mind and will of her own and did as she pleased; that she kept up with current events and read the newspaper daily. She further testified that Mrs. Mitchell had told her in 1939, or 1940, that she was going to give the farm to James because he had stayed at home with her and had taken care of her and thus had permitted her to live the remaining years of her life on the place where

she had been born and which she had inherited from her father.

Hattie Beals stated that she saw Mrs. Mitchell frequently from January 1943, until the time of her death, and saw her at or about the time the deed was executed and prior and subsequent thereto; that she talked with her frequently and Mrs. Mitchell talked intelligently, knew what she was doing, and there was nothing wrong with her mind. This witness also testified that Mrs. Mitchell told her that she expected to give the farm to James, and on one occasion expressed this intention to her in the presence of Effie Upton, another witness for the appellees.

James Goodall, Clyde Upton, his wife Effie Upton, Henry Harris, Harry Cherry, Media Upton, Latney Childress, Mrs. Frank Miller, Alma White, Marvin Cherry, Elta Upton, Lige Upton, Mrs. Marvin Cherry, Kathleen Upton, and Glea Mitchell, all testified that Mrs. Mitchell was in full possession of her mental faculties and related incidents and conversations to support their opinions. We do not think it is necessary to further elaborate on their testimony.

The first question to be disposed of is the attack made on the testimony of James Mitchell concerning the conversations and transactions with his deceased mother, which would ordinarily be incompetent under the provisions of Section 606, Subsection 2 of the Civil Code of Practice. Attack is also made on the testimony of Gillie Mitchell, the present wife of James Mitchell, but this marriage did not take place until after the death of Mrs. Jane Mitchell, and her testimony related to transactions and conversations with Mrs. Mitchell at a time when she was single. It must also be remembered that the deed was made to James Mitchell and not to his wife, and that she has only potential interest in this litigation. However, be that as it may, it is not necessary to consider the testimony of Gillie Mitchell in determining the issues involved here, and it is therefore not necessary to pass upon the chancelor's rulings on the exceptions to her deposition. See Stacy's Adm'r et al. v. Stacy et al., 296 Ky. 619, 178 S. W. 2d 42; Corbin Coal Co. et al. v. Hart, 301 Ky. 4, 190 S. W. 2d 673.

Referring again to the deposition of James A. Mitchell, the record shows that the appellants took his

deposition as if under cross examination and filed it, making it a part of the record in this case. They thereby waived the incompetency of this testimony and made the appellee a competent witness to testify in his own behalf concerning all the matters mentioned and referred to in his deposition given as if under cross examination. That deposition is here as a part of the record on this appeal and it shows that the questions asked him covered practically all the issues involved, consequently the exceptions filed to this deposition were properly overruled. This rule is so well settled that it needs no elaboration. See Coy v. Pursifull, 249 Ky. 57, 60 S. W. 2d 93; Hull et al. v. Simon, 278 Ky. 442, 128 S. W. 2d 954; Martin v. Martin et al., 286 Ky. 408, 150 S. W. 2d 696, and Mutual Life Insurance Co. v. Green, D. C., 37 F. Supp. 949.

Turning now to the merits of the case, it appears that the solution calls for the application of well settled principles of law. This court has considered many cases of this nature. One of the cardinal principles to be kept in mind is that the cancellation of an executed deed is the exertion of the most extraordinary power of a court of equity, which ought not to be exercised, except in a clear case and on strong and convincing evidence. Schimmelpfennig et al. v. Jungkind, 273 Ky. 182, 115 S. W. 2d 895; Lossie v. Central Trust Co. of Owensboro, 219 Ky. 1, 292 S. W. 338; Fields v. Cornett, 254 Ky. 35, 70 S. W. 2d 954; Petrey's Adm'r v. Petrey, 262 Ky. 222, 90 S. W. 2d 4.

As said in the Jungkind case [273 Ky. 182, 115 S. W. 2d 898]: "If the evidence merely raises a suspicion of fraud, question of undue influence, or uncertainty of mental capacity, it is not sufficient to set aside a deed or other instrument."

At best, the evidence introduced for the appellants raises no more than a doubt or suspicion as to the mental capacity of the grantor. The overwhelming evidence produced for the appellees more than overcomes any presumptions or inferences that may have been raised by the testimony of the witnesses for appellants. It is apparent that the chancellor could not do other than dismiss the petition and deny the relief sought.

It is argued for the appellants that there was never an effectual delivery of the deed. There is no evidence to

558

support this contention. On the contrary, the possession of the deed by the grantee created a presumption of delivery and there is no evidence whatever to overcome this presumption. (See McHargue et al. v. McHargue et al., 269 Ky. 355, 107 S. W. 2d 278; Preston et al. v. Harlow, 276 Ky. 799, 125 S. W. 2d 726. In addition there is substantial testimony to the effect that this deed was executed pursuant to a fixed purpose of the grantor which she had expressed before and after the date on which the deed was executed.

The judgment of the court was correct and it must be and is affirmed.